THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JAMES R. KIRK, Defendant-Appellee.

Fourth District   Nos. 4—96—0620, 4—96—0741 cons.

Opinion filed August 29, 1997.—Rehearing denied October 1, 1997.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Perry Miller, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Carey J. Luckman, of Pontiac, for appellee.

JUSTICE GARMAN delivered the opinion of the court:

Defendant James R. Kirk was arrested for driving under the influence of alcohol (DUI) (625 ILCS 5/11—501(a)(2) (West 1994)). After he submitted to blood and urine tests, defendant's driver's license was summarily suspended pursuant to section 11—501.1 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/11—501.1 (West 1994)). Subsequently, he filed a petition to rescind his statutory summary suspension and a motion to quash arrest and suppress evidence of the urine test. Following separate hearings, the circuit court of Livingston County (1) rescinded the summary suspension of defendant's driver's license and (2) barred any evidence of the urine test at trial. The State appeals both orders.

On July 1, 1996, a hearing was held on the petition. Illinois State Trooper Michael Ross testified that on the evening of April 1, 1996, he arrived at an accident scene near Pontiac, Illinois. A few vehicles were parked on the shoulder of the road. Another vehicle had gone

off the road and into a field. As he walked toward the field, Ross observed Sergeant Beoletto assisting defendant away from the car. He also saw a body trapped underneath the car. He felt the body and found it to be cold, with no pulse. He attempted to jack the car up to get it off the body, but the jack sank into the dirt.

The Pontiac fire and rescue squad arrived and used air bags to lift the car, but they were unable to save the victim. Ross walked over to Beoletto and defendant. Beoletto informed Ross that defendant was the driver of the car. Defendant was kneeling down. His eyes were glassy and bloodshot and his face was flushed. He was not crying. Defendant told him the victim was his girlfriend. Ross noticed his speech was a bit slurred. Ross also noticed a strong odor of alcohol. He informed defendant that his girlfriend had died. Defendant began to cry and stated that he wanted to see the body.

Ross walked over to the firemen and spoke with them about defendant viewing the body. They advised against it. When Ross returned, defendant was slowly pacing. He displayed poor balance and coordination as he walked. He seemed disoriented. Ross admitted they were standing in a dirt field and the ground was not flat. He told defendant the fireman advised against him viewing his girlfriend and they wanted him to obtain medical treatment for a cut on his head. Defendant bent over and put his hands on his knees. A fireman asked him if he needed a stretcher, but defendant did not reply. Ross asked defendant if he needed a stretcher and, again, defendant did not reply. Ross told the fireman to bring a stretcher. Ross then asked defendant if he could see his driver's license to obtain some information. Defendant did not reply. Ross asked him if he had some type of identification. Defendant was silent; he remained bent over, but he was not crying. Ross asked defendant if he could see his wallet. Without responding, defendant reached into his pocket, pulled out his wallet, and handed it to Ross. Ross retrieved defendant's license and returned the wallet. After obtaining defendant's information, Ross gave the license to the paramedics. Defendant was then transported to St. James Hospital in Pontiac.

Ross arrived at the hospital at approximately 11 p.m. and was directed to defendant's room. When Ross entered the room, he saw that defendant had just been given a urinal. Ross asked him if he was okay; defendant told him "yes." Ross noticed there was an odor of alcohol in the room and that defendant's eyes were bloodshot. Defendant's speech was still slurred. Ross asked him if he had been drinking and defendant replied affirmatively. Based upon his observations at the scene and in the hospital, Ross believed defendant had been driving under the influence of alcohol. He advised defendant

that he was under arrest. Ross testified there was nothing he saw at the scene or at the hospital to suggest drug influence.

Ross issued defendant a citation for DUI. He read defendant his warning to motorist and defendant agreed to take a blood test and a urine test. Ross testified that he asked for both tests because it is his standard procedure. He was trained to request both tests to check for alcohol and drugs. Again, Ross stated there was nothing to suggest defendant was under the influence of drugs. He then stated defendant's disorientation could have been caused by alcohol or drugs.

Ross identified defendant's exhibit No. 1 as the lab report from the Illinois State Police. The report showed the test results from the blood and urine samples obtained from defendant at the hospital. Defendant's exhibit No. 1 was admitted into evidence. The report showed defendant's blood-alcohol concentration (BAC) was 0.06 and indicated the presence of cannabis in defendant's urine.

Ross again testified that when he entered defendant's hospital room, he saw a nurse give defendant a urinal. Defendant proceeded to urinate while keeping himself covered with the blanket. When he was finished, the nurse placed the urinal on the counter. Approximately 45 minutes later, defendant provided Ross with a urine sample for testing.

No further evidence was presented. Defense counsel argued (1) Ross did not have probable cause for a DUI arrest; (2) if there was probable cause for a DUI arrest, there was no probable cause for Ross to obtain a urine sample from defendant; and (3) the urine sample was not obtained in accordance with the Illinois Department of Public Health (IDPH) regulations.

The trial court held there was probable cause for a DUI arrest. Ross' observations of defendant provided him with reasonable grounds to believe defendant was under the influence of alcohol. However, the court held there was no probable cause to justify Ross' request for a urine sample from defendant. Based upon its reading of the relevant case law, the court stated that an officer cannot request multiple chemical tests if he has no reason to believe drugs other than alcohol are involved. Otherwise, the court opined, law enforcement officers could conduct a "shopping spree" through a motorist's bodily fluids. Further, the court agreed with defendant that the urine sample was not obtained in accordance with IDPH regulations. It found that section 510.110 of title 77 of the Illinois Administrative Code (Code) (77 Ill. Adm. Code § 510.110 (1996)) regulated the collection of blood and urine for chemical analysis. However, there were only two standards set out by the section for the collection of urine: "[u]rine collection, if drugs other than alcohol are suspected," and

"[u]rine collection, if a blood alcohol could not be determined from other biological sources." 77 Ill. Adm. Code §§ 510.110(c), (d) (1996). The court noted that section 510.110(d) did not apply because defendant's blood alcohol could have been determined by the blood sample that was obtained. As for section 510.110(c), the court stated that drugs other than alcohol were *not* suspected in this case. Thus, it held the urine sample was not collected according to IDPH regulations and defendant's suspension should be rescinded. Accordingly, the trial court granted defendant's petition to rescind the summary suspension.

On August 30, 1996, a hearing was held on defendant's motion to quash arrest and suppress evidence. Both parties stipulated to Ross' prior testimony at the petition hearing. The State argued that Ross had probable cause to believe defendant was under the influence of some type of substance when he arrested him for DUI. Therefore, he could request multiple chemical tests. Further, the State argued defendant did not agree to submit samples for only one purpose or analysis.

The court noted Ross requested both tests because he was trained to do so, not because he suspected drugs, and that he had no justifiable reason to ask defendant to provide a urine sample. Thus, with no probable cause to support the request, the court found it inappropriate. The court also ruled that collection of the urine sample did not comply with IDPH regulations for the same reasons set out at the petition hearing. Accordingly, the court barred any evidence of the urine test at trial.

On appeal, the State argues the trial court erred in rescinding the summary suspension of defendant's driver's license and in barring evidence of the urine test results. Initially, we note that a trial court's determination in a rescission proceeding will not be overturned unless it is manifestly erroneous. *People v. Orth*, 124 Ill. 2d 326, 341, 530 N.E.2d 210, 217 (1988); *People v. Plummer*, 287 Ill. App. 3d 250, 252, 678 N.E.2d 1079, 1081 (1997). Likewise, a trial court's ruling on a motion to suppress evidence is also subject to reversal only if it is manifestly erroneous. *People v. Dilworth*, 169 Ill. 2d 195, 201, 661 N.E.2d 310, 314 (1996). For the reasons that follow, we find both decisions of the trial court (the rescission of defendant's summary suspension and the suppression of evidence relating to the urine test) to be against the manifest weight of the evidence.

We first address the trial court's finding that Ross did not have probable cause to request a urine sample from defendant. Although the court found Ross had probable cause to arrest defendant for DUI and request a blood sample, the court held that Ross was also

required to have specific probable cause that defendant was under the influence of drugs to request a urine sample for testing.

■ Section 11—501.1(a) of the Vehicle Code provides in relevant part:

> "Any person who drives *** shall be deemed to have given consent *** to a chemical test or tests of blood, breath, or urine for the purpose of determining the content of alcohol, other drug, or combination of both in the person's blood if arrested, as evidenced by the issuance of a Uniform Traffic Ticket, for any offense as defined in Section 11—501 or a similar provision of a local ordinance. The test or tests shall be administered at the direction of the arresting officer." 625 ILCS 5/11—501.1(a) (West 1994).

This statute is directed toward drivers who are chemically impaired. Furthermore, courts have consistently held section 11—501.1 of the Vehicle Code (625 ILCS 5/11—501.1 (West 1994)) should be liberally construed to accomplish its purpose of protecting the citizens of Illinois upon the highways. *People v. Shaffer*, 261 Ill. App. 3d 304, 306, 634 N.E.2d 31, 33 (1994).

■ Clearly, an officer must have probable cause to believe a driver is chemically impaired to arrest him for DUI. At that point, under the statute, the officer may request any or all of the tests to determine whether the driver is, in fact, chemically impaired. There is no requirement that an officer have individualized suspicion of drugs and/or alcohol before requesting multiple chemical tests.

In this case, Ross arrested defendant for DUI and issued him a ticket pursuant to section 11—501(a)(2) of the Vehicle Code. As a result, Ross was authorized to request defendant to submit to a blood test and a urine test "for the purpose of determining the content of alcohol, other drug, or combination of both in [defendant's] blood." 625 ILCS 5/11—501.1(a) (West 1994). He did not need individualized suspicion of drugs to request a urine sample from defendant.

■ Our holding is further supported by section 11—501.6(a) of the Vehicle Code, which provides in part:

> "Any person who drives *** and who has been involved in a personal injury or fatal motor vehicle accident, shall be deemed to have given consent to *** a chemical test or tests of blood, breath, or urine for the purpose of determining the alcohol or other drug content of such person's blood if arrested as evidenced by the issuance of a Uniform Traffic Ticket for any violation of the *** Vehicle Code or a similar provision of a local ordinance, with the exception of equipment violations." 625 ILCS 5/11—501.6(a) (West 1994).

Recently, in *Fink v. Ryan*, 174 Ill. 2d 302, 673 N.E.2d 281 (1996), our supreme court held that section 11—501.6 of the Vehicle Code is

constitutional. Under this section, the court explained, an officer can request a driver to submit to chemical testing without probable cause to believe he is chemically impaired if two conditions are met: (1) an accident occurs involving a serious personal injury or fatality, and (2) the driver is issued a traffic ticket for a nonequipment violation. *Fink*, 174 Ill. 2d at 310-12, 673 N.E.2d at 286-87.

Here, both conditions of section 11—501.6 of the Vehicle Code were met. First, defendant was involved in a traffic accident that resulted in a fatality—his girlfriend was killed. Second, defendant was issued a traffic ticket for DUI. Accordingly, defendant was subject to chemical testing for alcohol and drugs regardless of whether Ross had probable cause to believe he was chemically impaired. Therefore, Ross' request for a urine sample was proper.

We note the trial court relied upon *People v. Krosse*, 262 Ill. App. 3d 509, 636 N.E.2d 1033 (1994), and *People v. Klyczek*, 162 Ill. App. 3d 557, 516 N.E.2d 783 (1987), in deciding that Ross needed suspicion of drugs before he could request multiple tests. *Krosse* and *Klyczek*, however, are distinguishable from the present case.

In *Klyczek*, an officer observed the defendant's car weaving down the road. The officer stopped the defendant and administered field-sobriety tests, which the defendant failed. The officer arrested the defendant for DUI and requested that he submit to a breath test. The defendant complied and the test showed a BAC of 0.05. The officer then requested that the defendant submit to a blood test. The defendant refused and his license was summarily suspended. Subsequently, the trial court rescinded the suspension, finding that the defendant submitted to a breath test and his failure to undergo additional testing did not warrant suspension of his license. The appellate court reversed, holding that under certain circumstances a driver's refusal to submit to multiple tests warrants suspension of his license. However, the court also held that multiple chemical tests are not always proper; additional tests are warranted only if the officer can show that circumstances supported a request for a second test. In that instance, the officer testified the blood test was requested not merely to confirm the defendant's alcohol level, but to test for drugs as well. *Klyczek*, 162 Ill. App. 3d at 561-62, 516 N.E.2d at 787.

Similarly, in *Krosse*, an officer stopped the defendant after observing him weave across the center lane of the road. The defendant was loud and belligerent and began swearing at the officer. He submitted to a breath test, which showed a BAC of 0.07. The officer then asked the defendant to submit to a blood test. The defendant refused and his license was suspended. At the hearing on the petition to rescind the suspension, the officer testified he requested the blood sample to

test for drugs because the results of the breath test were not consistent with defendant's behavior. The trial court ruled there were reasonable grounds to request a second test. Relying on *Klyczek*, the appellate court affirmed. It held that the second test was a reasonable request by the officer because its purpose was not to get a higher blood-alcohol reading but, rather, to determine the presence of drugs. *Krosse*, 262 Ill. App. 3d at 512, 636 N.E.2d at 1035.

■ In both *Krosse* and *Klyczek*, the officers requested additional chemical tests only after the results of the first tests did not reveal a BAC of 0.10 or higher. Accordingly, the officers were required to show that their request for additional tests was for some reasonable purpose and not merely to get evidence of a higher BAC. In the present case, however, Ross did not request a test that indicated a BAC below the legal limit and then proceed to request an additional test in search of a better result. Rather, he requested both a blood test and a urine test at the same time. Further, the blood sample was only tested for alcohol, and the urine sample was only tested for drugs. Under these conditions, there was nothing unreasonable about Ross' request for multiple tests.

■ Next, we address the trial court's finding that collection of the urine sample from defendant did not comply with IDPH regulations. Section 510.110 of title 77 of the Code sets out the IDPH standards for collection of blood and urine for chemical testing. Sections 510.110(a) through (d) provide:

"a) Blood Collection. ***

\* \* \*

b) Blood and urine samples shall be tested to determine the concentration of alcohol and/or other drugs present by a laboratory method acceptable in a court of law.

c) Urine collection, if drugs other than alcohol are suspected.

\* \* \*

d) Urine collection, if a blood alcohol could not be determined from other biological sources." 77 Ill. Adm. Code §§ 510.110(a) through (d) (1996).

The trial court found that the standards for urine collection fall under sections 510.110(c) and 510.110(d) of the Code. However, section 510.110(d) was inapplicable in this case because defendant's BAC could be determined by the blood sample obtained. The court held that section 510.110(c) was also inapplicable because Ross did *not* suspect drugs other than alcohol. Hence, the court concluded there were no standards to be applied in this case and, thus, the urine sample was not collected according to IDPH regulations.

A close examination of the regulations shows that sections

510.110(c) and 510.110(d) have distinct purposes. Section 510.110(c) addresses the collection of a urine sample for drug testing, while section 510.110(d) sets out the procedure to be used when collecting a urine sample for BAC analysis. In this case, Ross requested a urine sample from defendant for drug testing. On these facts alone, section 510.110(c) would be the applicable standard. However, we must address whether it also requires an officer to have suspicion of drugs in order for the collection standard to apply.

The standards promulgated by IDPH are intended to prevent an accused person being subjected to inaccurate testing procedures by law enforcement officers. *People v. Haney*, 155 Ill. App. 3d 44, 46, 507 N.E.2d 230, 231 (1987). Hence, the accuracy and validity of a urine test rest on the collection procedures set out in these sections. However, whether or not an officer has suspicion of drugs prior to requesting a urine sample has no substantive effect on the test results. Accordingly, such a requirement would serve no purpose.

Furthermore, limiting section 510.110(c) to those instances where an officer suspects drugs would create a serious anomaly in the IDPH regulations. As noted earlier, under certain circumstances, section 11—501.6 of the Vehicle Code eliminates the need for an officer to have probable cause that a driver is under the influence of alcohol or drugs before requesting chemical tests. In those cases, however, there would be no applicable standard or procedure for the collection of urine for drug testing because the officer did not suspect drugs. We do not believe IDPH intended such a result.

We conclude that the statutory language at issue in this case—"if drugs other than alcohol are suspected"—is only meant to distinguish between urine collection for drug testing and urine collection for BAC testing. 77 Ill. Adm. Code § 510.110(c) (1996). Accordingly, we hold the urine collection standards set out in title 77, section 510.110(c) of the Code are not limited to only those cases in which an officer suspects drugs. The standards are applicable to all cases in which urine is collected for the purpose of testing for drugs.

For the foregoing reasons, we reverse the judgments of the Livingston County circuit court and remand the cause for further proceedings.

Reversed and remanded.

McCULLOUGH and COOK, JJ., concur.