2016 IL App (1st) 143352

FIFTH DIVISION
JUNE 3, 2016

No. 1-14-3352

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | No. YW267981 |
| v. | ) ) | No. YW267982 |
| PAUL CIBOROWSKI, | ) ) ) | The Honorable Richard Schwind, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     After a bench trial, defendant Paul Ciborowski was found guilty of driving under the influence of drugs (DUI) and of failing to reduce speed to avoid an accident, and was sentenced to two years of probation and a suspended sentence of 364 days' incarceration. Defendant's conviction stemmed from a three-vehicle collision in Palatine, Illinois, on March 22, 2013.

¶ 2    On appeal, defendant contends, first, that the trial court erred when it denied his motion to suppress evidence based on a lack of probable cause that he was driving under the influence of drugs. Second, defendant contends that the trial court abused its discretion when it allowed Palatine Police Sergeant Gregory Hart's testimony for the limited purpose of discussing the general effects of the prescription drugs, citalopram and quetiapine. Lastly, defendant claims that the evidence was insufficient to show whether he was under the influence of drugs to a degree that it rendered him incapable of driving safely.

¶ 3    For the following reasons, we affirm the trial court's denial of defendant's motion to suppress and find that the trial court did not abuse its discretion when it allowed testimony from a drug expert witness to testify as to his opinion on the effects of certain drugs on individuals. The parties refer to this expert as a drug recognition expert. Lastly, we conclude that there was sufficient evidence to support defendant's conviction. Accordingly, we affirm defendant's conviction.

¶ 4                               BACKGROUND

¶ 5                              I. The Charges

¶ 6    Defendant was issued three separate traffic citations as a result of his involvement in the three-vehicle collision. Defendant was charged with: (1) failing to reduce his speed to avoid a collision (625 ILCS 5/11-601(a) (West

2014));[1] (2) driving under the influence of drugs (625 ILCS 5/11-501(a)(4) (West 2014));[2] and (3) failing to provide proof of valid insurance (625 ILCS 5/3-707(b) (West 2014)).[3] The arresting police officer also noted on the citations that defendant was driving in excess of the 30 miles per hour speed limit at the time of the collision.

¶ 7                                II. Defendant's Pretrial Motions

¶ 8          On April 1, 2014, defendant filed a petition to rescind his statutory summary suspension.[4] Defendant alleged: (1) that Officer Bruce Morris did not properly place him under arrest for an offense as defined in section 11-501 of the Illinois Vehicle Code (625 ILCS 5/11-501.1 (West 2014) (driving under the influence of alcohol or drugs)) or similar provision of a local ordinance; (2) that Officer Morris did not have reasonable grounds to believe that defendant was driving or in actual physical control of a motor vehicle while under the influence of alcohol and/or other drugs, or a combination of them; (3) that

---

[1] "Speed must be decreased as may be necessary to avoid colliding with any person or vehicle ***." 625 ILCS 5/11-601(a) (West 2014).

[2] "A person shall not drive *** under the influence of any *** drug or combination of drugs to a degree that renders the person incapable of safely driving ***." 625 ILCS 5/11-501(a)(4) (West 2014).

[3] "Any person who fails to comply with a request by a law enforcement officer for display of evidence of insurance *** shall be deemed to be operating an uninsured motor vehicle." 625 ILCS 5/3-707(b) (West 2014).

[4] Defendant certified that the statements set forth in his petition were "true and correct."

Officer Morris did not properly warn defendant as required by section 11-501.1(c) of the Illinois Vehicle Code (625 ILCS 5/11-501.1(c) (West 2014));[5] (4) that defendant did not refuse to submit to and/or complete the required chemical test or tests, pursuant to section 11-501.1(c) of the Illinois Vehicle Code (625 ILCS 5/11-501.1(c) (West 2014)) upon the request of the arresting officer; (5) that the notice of summary suspension was not sworn to under oath as required by statute; (6) that defendant did not receive proper service of the citations issued; and (7) that the tests given to defendant did not conform to the requirements imposed by the Illinois Department of Health.

¶ 9        On May 9, 2014, defendant filed a motion to quash his arrest and suppress evidence for lack of probable cause. Defendant argued that his arrest was improper and the evidence obtained during it must be suppressed because: (1) Officer Morris was not justified in prolonging the traffic stop and detaining defendant in order to determine whether defendant was under the influence of drugs; (2) Officer Morris asked defendant to exit his vehicle without reasonable suspicion that defendant was driving under the influence of alcohol or drugs; and (3) Officer Morris was not a drug recognition expert and therefore did not

[5] "A person requested to submit to a test *** shall be warned by the law enforcement officer requesting the test that a refusal to submit to the test will result in the statutory summary suspension of the person's privilege to operate a motor vehicle ***." 625 ILCS 5/11-501.1(c) (West 2014).

have the requisite skills or training to testify regarding whether someone was under the influence of drugs.

¶ 10                                    III. Pretrial Hearing

¶ 11          On May 9, 2014, the trial court held a hearing on defendant's petition and motion to suppress. Officer Morris testified that he was dispatched to a three-vehicle collision. After arriving on the scene within minutes of the accident and speaking with the three drivers involved in the collision including defendant, the officer concluded that defendant had caused the accident by rear-ending the vehicle in front of him. Officer Morris testified that defendant's vehicle sustained severe damage to its front end, was leaking fluid, and was inoperable.

¶ 12          Officer Morris testified that, during his initial conversation with defendant, who was seated in the driver's seat, defendant gave conflicting answers about where he lived. Defendant initially told Officer Morris that he lived in Arlington Heights and then told him that he lived in Palatine, Illinois. Defendant also gave conflicting answers about how the accident occurred. First, defendant admitted that he had struck the vehicles in front of him with his motor vehicle and then he claimed that the vehicles had struck his vehicle. When the officer asked defendant for an insurance card, defendant handed him his AARP bond card.

¶ 13          Officer Morris described defendant as having a disheveled appearance:

"ASSISTANT STATE'S ATTORNEY (ASA): And his general–He was disheveled, wasn't he?

OFFICER MORRIS: Yes. His shirt was untucked and unbuttoned and his hair was mussed, and–

ASA: And his general movements, they seemed deliberate and lethargic, didn't they?

OFFICER MORRIS: Yes, they did."

¶ 14    Officer Morris testified that he eliminated the possibility that defendant was under the influence of alcohol because defendant did not have the odor of alcohol on his breath, and did not have bloodshot or glassy eyes. Officer Morris never suspected defendant of being under the influence of cannabis, nor did he observe any type of controlled substance.

¶ 15    Officer Morris testified that he asked defendant to step out of his damaged vehicle and sit in the backseat of the police vehicle, in order to ensure defendant's safety as the officer prepared a crash report. During this time, Officer Morris and defendant were engaged in a free-flowing conversation, and the officer observed that defendant's pupils were dilated and that defendant had difficulty keeping his eyes open. Defendant looked sleepy and his speech was mush-mouthed and slurred. Officer Morris inquired whether defendant was taking any drugs:

"ASA: And then you asked him if he had taken any drugs, right?

OFFICER MORRIS: I asked him if he were–Yeah. If he were prescribed medication.

ASA: And he told you that he takes Zoloft, Ambien, and Celexium, correct?

OFFICER MORRIS: That was his statement at the time."

¶ 16        Officer Morris then asked defendant to take field sobriety tests. The first test was the horizontal gaze nystagmus (HGN) test where the officer looks into defendant's eyes with a flashlight. During this test, defendant was wobbling, waving, swaying, and had a hard time standing up, to the point where the officer was concerned that defendant would fall over and onto the pavement. The second test was the walk-and-turn test. Defendant could not walk heel-to-toe, could not remember directions, took 18 steps instead of 9 steps, swayed while walking, and had a hard time keeping his balance. Officer Morris terminated the test to ensure his and defendant's safety. The third test was the one-leg stand test. During this test, defendant leaned against the police vehicle and fell over before even attempting the test. Defendant had to be helped to prevent a fall, during each of the three times that he attempted to lift his foot. Again, Officer Morris terminated the test to ensure his and defendant's safety. After defendant's performance on these three field sobriety tests, Officer Morris

arrested defendant because he "believed that based on the totality of the circumstances that he was under the influence of some kind of drug."

¶ 17       Officer Morris testified that, although he worked extensively in illegal narcotics, he never dealt specifically with prescription medication. Throughout his career with the Palatine police department, he had observed people under the influence of alcohol. Officer Morris received training at the police academy on drug and alcohol detection. However, he was not a drug recognition expert.

¶ 18       On cross-examination, Officer Morris testified that, in his professional experience, he had observed hundreds of people under the influence of drugs. The spectrum of drugs ranged from illegal drugs "such as cocaine and crack [where] you get erratic, irrational behavior" to "the other end of the spectrum such as anti-depressants and sleeping aids, [where] you get people that are tired and sleepy."

¶ 19       On redirect examination, Officer Morris testified about his knowledge of the prescription drugs Zoloft, Ambien, and Celexium, and their side effects:

> "DEFENSE COUNSEL: What is Zoloft?
>
> OFFICER MORRIS: I want to say an anti-depressant?
>
> DEFENSE COUNSEL: Do you know?
>
> OFFICER MORRIS: I can't say for certain.

DEFENSE COUNSEL: Do you know what effect it has on someone?

OFFICER MORRIS: Well, if it's an anti-depressant that would indicate that somebody is feeling down and sad, and Zoloft would probably perk them up.

DEFENSE COUNSEL: That is assuming it is an anti-depressant?

OFFICER MORRIS: Yes; that's assuming.

DEFENSE COUNSEL: What effects does it have on someone's cognitive abilities?

OFFICER MORRIS: No idea.

DEFENSE COUNSEL: What effect does it have [on] someone's ability to drive?

OFFICER MORRIS: I don't know.

DEFENSE COUNSEL: What about Ambien? What is Ambien?

OFFICER MORRIS: I believe it's a sleeping aid.

DEFENSE COUNSEL: And do you know or do you believe?

OFFICER MORRIS: Based on what I have seen on television and with the commercials and what not.

DEFENSE COUNSEL: So it's not based on any training?

OFFICER MORRIS: No, sir.

DEFENSE COUNSEL: Okay. And of all the people that you have arrested, how many for driving under the influence of something or being under the influence of drugs? Because you testified during your cross that you have seen individuals under the influence of drugs, how many people have been under the influence of Ambien?

OFFICER MORRIS: Maybe a handful. People use it to kill themselves or try to kill themselves, rather.

DEFENSE COUNSEL: It's a prescription medication?

OFFICER MORRIS: Yes.

DEFENSE COUNSEL: So people take it for something other than suicide?

OFFICER MORRIS: Yes.

DEFENSE COUNSEL: And Zoloft how many people have you seen under the influence of Zoloft?

OFFICER MORRIS: I couldn't say–None.

DEFENSE COUNSEL: You indicated as a last one Celexium or possibly Celexa, right?

OFFICER MORRIS: Yes.

DEFENSE COUNSEL: What is that?

OFFICER MORRIS: I have no idea.

DEFENSE COUNSEL: Is it a medication?

OFFICER MORRIS: I believe so. Yeah, I mean, I asked him if he had any prescription–if he was on any prescription medications and he said Celexium. So I presumed that is a prescription medicine.

DEFENSE COUNSEL: And you wouldn't know what effects that would have on a human being?

OFFICER MORRIS: No, sir. I wouldn't."

¶ 20    The trial court reserved its ruling, and allowed each party to research additional case law, and continued the matter until May 19, 2014.

¶ 21                        IV. Trial Court's Ruling

¶ 22    On May 19, 2014, the trial court: (1) denied defendant's petition to rescind his statutory summary suspension; and (2) denied the motion to quash his arrest and suppress evidence. The trial court reviewed the evidence in detail and found:

"THE COURT: [Officer Morris] testified he's been a police officer for 14 years. Three of those years he served in the gang unit, where he's observed hundreds of people under the influence of drugs, including several under Ambien.

11

It's clear that officers may rely on their training and experience to draw certain inferences and make deductions that might elude an untrained person. He was dispatched to a three-car crash where he determined the defendant rear-ended the car that was in front of him and then pushed that car into the car in front of that car. The defendant refused treatment, stated he had no injuries and no impairments; that he did tell the officer he was taking prescription medications; that the officer noted he had slurred speech; he was mush-mouthed; he was sleepy; that he said he hit other vehicles at first and then he later changed that to that the vehicles him; that he gave two different locations where he lived; that he gave different areas of where he was going, roads he was going to travel on, roads that didn't intersect each other; that when asked for an insurance card, he gave his AARP card, and on several occasions gave it back to the officer; that his shirt was untucked, it was unbuttoned; his hair was mussed; he was deliberate and lethargic, appeared confused; his pupils were dilated; he had a hard time keeping his eyes open. He told the officer he was taking Zoloft, Ambien, which the officer believed to be a sleeping aid, and [Celexium]; that he had a hard time standing. And again, the arguments that counsel makes about the field sobriety tests may be persuasive arguments as to the guilt, but I think as to the officer's

observations of what the defendant was doing would go towards reasonable grounds. And here, while performing the HGN test, the defendant was wobbling, waving, had a hard time keeping in position; that during the walk-and-turn test he did not touch heel-to-toe. He took 18 steps forward instead of nine, and then couldn't remember what to do, couldn't keep his balance, and at that point the officer had to terminate the test for safety reasons. During the one-leg-stand test, he lost his balance. He had to be caught by the officers, and they had to put him on the hood of the car. He swayed; he lifted his arms; that he put his foot down on numerous occasions and almost fell over.

Again, the officer testified he's seen hundreds of people under the influence of drugs, including several under Ambien, and the observations he made of the defendant were consistent with someone he believed to be under the influence of drugs.

I had an opportunity to judge his demeanor and manner while testifying. I found him to be very credible. He answered the questions in a very credible manner. He didn't try and alter answers or try and be argumentative. When he didn't know something, he didn't know something. He was very honest in all of his responses. I think under these factual considerations, the officer made a reasonable and prudent

13

circumstances looking at the prudent decision based upon the totality of the circumstances, the facts known to him were sufficient to lead a reasonably cautious person to believe that the defendant committed a crime. So the petition to rescind will be denied *** the motion to quash for the same reasons will be denied."

¶ 23                                    V. Evidence at Trial

¶ 24        On July 16, 2014, defendant's bench trial commenced. The State's evidence consisted of the testimony of four witnesses: (1) David Nielsen, one of the drivers involved in the three-vehicle crash; (2) Officer Morris, the arresting police officer; (3) Cynthia Woods, a toxicologist with the Illinois State Police, and (4) Sergeant Gregory Hart of the Illinois State Police.

¶ 25                                    A. David Nielsen

¶ 26        David Nielsen, one of the other drivers, testified that, at 4:55 p.m. on March 22, 2013, he was involved in a three-vehicle accident on Dundee Road, west of Hicks Road in Palatine, Illinois. While his vehicle was stopped in traffic, it was hit by another vehicle, and, as a result of the impact, his vehicle struck the rear of the vehicle in front of him. Nielsen exited his vehicle and confirmed that another vehicle had hit his vehicle from behind. He observed that the back-end rear bumper of his vehicle was pushed in extensively and that the front license plate of the vehicle behind him was lodged around the exhaust

pipe of his vehicle. In court, Nielsen identified defendant as the driver of the vehicle that struck his vehicle. After the accident, Nielson approached defendant and asked him "if he was okay and what happened." Nielson described defendant as "[not] very alert, [not] very cognitive or very alert." Nielsen recalled his surprise that defendant did not exit his vehicle to observe what had happened, but then Nielsen noticed defendant's disheveled appearance. Nielsen called the police, who arrived approximately five minutes later. While Nielsen was waiting for the police to arrive, defendant did not exit his vehicle.

¶ 27        On cross-examination, Nielsen testified that there were three vehicles involved in the accident, that the damage to all three vehicles was significant and that the damage to his vehicle would cost roughly $10,000 to repair. As to the damage to defendant's vehicle, the front bumper was pushed in and there was liquid flowing out of the radiator. Nielsen did not know why defendant was not alert. Nielsen had never observed defendant prior to this occasion and Nielsen was unable to determine whether defendant was injured in the accident.

¶ 28                          B. Police Officer Bruce Morris

¶ 29        Officer Morris testified that he had been employed with the Palatine police department for 15 years. At 4:55 p.m. on March 22, 2013, Officer Morris was dispatched to a traffic accident involving three vehicles. In court, Officer

Morris identified defendant as the driver of one of the vehicles involved in the collision. Officer Morris testified that defendant was driving the easternmost vehicle, and the other two vehicles involved in the accident were in front of him proceeding westbound on Dundee Road. The second vehicle involved in the accident belonged to Nielsen, and Officer Morris identified Nielsen in court.

¶ 30    Officer Morris testified that he determined defendant had rear-ended Nielsen's vehicle based on his observation that defendant's license plate was stuck to Nielsen's vehicle. Defendant was sitting in the driver's side of his vehicle and appeared "lethargic and tired" with "disheveled" clothes. Officer Morris asked defendant for his driver's license and insurance card and defendant fumbled through his stack of cards and produced an AARP bond card.

¶ 31    Officer Morris then asked defendant to exit his vehicle and sit in his squad vehicle to ensure defendant's safety. When Officer Morris asked defendant how the accident occurred, defendant initially responded that he struck the vehicle in front of him. Then, defendant stated that the "vehicle struck him." When the officer asked defendant where he lived, defendant initially responded that he lived in Arlington Heights; but then, defendant claimed that he lived in Palatine. Officer Morris observed that defendant's

vehicle was leaking fluid and was rendered inoperable and that the damage to the front of defendant's vehicle was severe.

¶ 32      Officer Morris and defendant engaged in a conversation while defendant was seated in the backseat of Officer Morris's squad vehicle. Officer Morris made the following observations about defendant's appearance:

"ASA: Did you at this point make any observation about his eyes?

OFFICER MORRIS: His pupils appeared to be dilated.

ASA: Did he have an easy or difficult time keeping his eyes open?

OFFICER MORRIS: He appeared drowsy at times, almost falling asleep with his eyelids closing.

ASA: How would you describe his speech?

OFFICER MORRIS: Deliberate, slow at times. I believe even slurred. It was almost a year and a half ago.

ASA: Did he have an odor of alcohol emanating from his breath?

OFFICER MORRIS: I did not smell alcohol.

ASA: Were his eyes bloodshot and glassy?

OFFICER MORRIS: I did not observe that.

ASA: Did you smell an odor of cannabis from him?

OFFICER MORRIS: I did not.

ASA: And at any point did the defendant attempt to give you insurance again?

OFFICER MORRIS: Yes. He attempted to give me his AARP bond card. Again, I explained to him that wasn't what I was looking for."

¶ 33 Officer Morris then inquired whether defendant was taking any drugs and defendant responded that he was taking Zoloft, Ambien, and Celexium.

¶ 34 Officer Morris asked defendant where he was driving from prior to the accident. Initially, defendant said he was coming from a Speedway gas station and then said he was coming from Golf Road, Dundee Road, and Palatine Road. Officer Morris stated that none of those roads intersect each other; they are all east-west roads. Officer Morris asked defendant if he had any injuries and then proceeded to administer sobriety tests.

¶ 35 Officer Morris first administered the HGN test. Defendant had a "hard time" maintaining his balance. Defendant "was swaying," had "difficulty standing up," and "was on the hood of [the] squad car." Officer Morris testified that, while administering the HGN test, he observed nystagmus.

¶ 36 The second test was the walk-and-turn test. Officer Morris instructed defendant to "start with either foot," "walk heel to toe nine paces out," "pivot on one foot and turn around," and then "walk heel to toe nine paces out." Officer Morris demonstrated the walk-and-turn test to defendant. Defendant

"failed to walk heel to toe with any of the steps going out." Defendant took 18 steps instead of the 9 steps he was instructed to take. Defendant also failed to pivot. Defendant "was swaying" and "having difficulty keeping [his] balance."

¶ 37    The third and final test was the one-leg stand. The officer instructed defendant to raise one foot approximately six inches off the ground, keep his arms at his side and count out loud "1001, 1002, 1003, all the way up to 30." Before attempting this test, defendant leaned against the police vehicle for support. Defendant failed the one-leg stand on each of his three attempts because he kept placing his foot down before counting to 30. Officer Morris terminated the test because defendant nearly fell over two times.

¶ 38    After defendant's performance on the three field sobriety tests, Officer Morris arrested defendant because "[b]ased on the totality of the circumstances *** [the officer opined that defendant] was driving under the influence of some kind of narcotic." Officer Morris transported defendant to the Palatine police department and read a "warning to motorist" to defendant. Defendant agreed to submit to a blood and urine draw and then was transported to Northwest Community Hospital for testing.

¶ 39    Once at the hospital, defendant waived his *Miranda* rights[6] and told Officer Morris that he was operating a vehicle. When the officer asked

---

[6] The record does not state how defendant waived his *Miranda* rights.

defendant what street or highway he was on, defendant said Valentine Road, then Palatine Road, and Arlington Heights Road. Officer Morris then asked defendant what direction of travel he was in. Defendant responded "[e]ast." Officer Morris found defendant in the westbound lanes. Officer Morris asked defendant where he was going; defendant responded "to get a soda pop." Officer Morris stated that this conflicted with previous answers defendant had provided before defendant was Mirandized. Officer Morris described defendant's conflicting answers:

"ASA: What was his response before?

OFFICER MORRIS: That he was on Golf Road. He was on Palatine Road. He was going to the Speedway.

ASA: Did you ever ask him what time it was?

OFFICER MORRIS: Yes.

ASA: What did he tell you?

OFFICER MORRIS: I believe he told me approximately 10:00 or 10:30.

ASA: What was the actual time?

OFFICER MORRIS: At the time of this questioning [it] was approximately 6:31, 6:32 p.m.

ASA: Did you ask him what the date was?

20

OFFICER MORRIS: Yes, I did.

ASA: What did he tell you?

OFFICER MORRIS: I believe the 17th or 18th.

ASA: What was the actual date?

OFFICER MORRIS: The 22nd.

ASA: Did you ask him what day of the week it was?

OFFICER MORRIS: Yes.

ASA: What was his response?

OFFICER MORRIS: Thursday he said.

ASA: What was the actual day?

OFFICER MORRIS: Friday.

ASA: Did you ask him what he was doing for the last three hours?

OFFICER MORRIS: Yes.

ASA: What was his response?

OFFICER MORRIS: Sitting at a gas pump.

ASA: Did you ask him if he was drinking?

OFFICER MORRIS: Yes.

ASA: His response?

OFFICER MORRIS: No.

ASA: Did you ask him if he was involved in an accident today?

OFFICER MORRIS: Yes.

ASA: What was his response to that?

OFFICER MORRIS: No."

¶ 40    Officer Morris again gave defendant a *Miranda* warning advising him that they would be "discussing things about the crash." Defendant asked Officer Morris if he had been involved in a crash and if he was going to lose his license. Officer Morris also observed defendant speaking to himself. Officer Morris recalled, "[defendant] talked about some narcotics or some prescription drugs *** he was taking."

¶ 41    Defendant submitted to testing at the hospital. Officer Morris observed that the urine sample container was sealed, labeled, dated, and placed in a sealed and labeled DUI kit. Officer Morris then took possession of the DUI kit and transported it back to the police station where he placed it in a temporary storage prior to it being sent to the State lab for testing.

¶ 42    Officer Morris was asked how many DUI drug investigations he had been involved in; he responded "[n]ot many, a handful, I believe," "maybe two, maybe three." The trial court allowed Officer Morris to render an opinion that he believed defendant was "under the influence of some kind of narcotic." Officer Morris testified that he formulated his opinion based on his training and

experience[7] and observations of defendant, including his "lethargic behavior," inability to provide proper documentation, conflicting answers, appearance of almost falling asleep in the backseat of the squad vehicle, dilated pupils, incoherent answers, disheveled look, and failure of the field sobriety exams.

¶ 43    On cross-examination, Officer Morris testified that he did not observe anyone driving when he arrived at the scene of the accident. However, the accident involved significant impact based on the damage done to defendant's vehicle and the vehicle ahead of it. Officer Morris suspected defendant might be injured as a result of the accident and observed that defendant provided incoherent responses. Defendant stated that he takes Zoloft, Ambien, and Celexium. Prior to the accident, Officer Morris never heard of Celexium. The only information he knew regarding the side effects of these medications was what he heard on television and not from what he learned in training or during his career as a police officer. In his 15 years as a police officer, he had "maybe three" DUI drug investigations. He conducted no narcotics investigations involving Zoloft, Ambien, Celexium, Seroquel, and Gabapentin. In the past, he had responded to calls for people who had attempted to overdose on sleeping

---

[7] Officer Morris testified he was a gang investigator for three years and "conducted numerous narcotics investigations." He also "dealt with a lot of people under the influence of illegal and legal narcotics through the course of [his] duties as a 15-year police officer ***." He investigated "numerous attempted overdoses of narcotics" and "prescription narcotics," and observed "the way people act and respond when they're under the influence at that time."

pills and that he had observed their behavior. He believed Ambien was a sleeping pill based on his layman's knowledge of what he had observed on television.

¶ 44    Officer Morris eliminated the possibility that defendant was under the influence of alcohol because defendant did not have the odor of alcohol, and he did not have bloodshot and glassy eyes. Officer Morris never suspected defendant was under the influence of cannabis.

¶ 45    Officer Morris admitted he was not a drug recognition expert. He was unaware there is a 12-step process in order to assess a suspect accused of driving under the influence of drugs. He did not conduct the Romberg balance test or the finger-to-nose test. He did not examine defendant's vital signs, blood pressure, temperature, or pulse. Officer Morris was unaware if a drug would impact someone's temperature or pulse. Officer Morris did not conduct any kind of darkroom examinations. He did not test defendant's pupils under different lighting. He also did not examine defendant's muscle tone or check for injection sites on defendant.

¶ 46    Officer Morris attempted to contact a drug recognition expert from the department to come to the scene to conduct an examination. He initially thought

Officer Kalanka[8] had the requisite knowledge, but he did not. He was unaware of anyone in the Palatine police department who was a drug recognition expert.

¶ 47    Officer Morris indicated that, during the HGN test, defendant had difficulty standing. Officer Morris was unaware of whether this was a result of the accident or whether defendant normally had difficulty standing. Officer Morris had not observed defendant before and, therefore, was unable to tell the trial court whether or not defendant had poor balance.

¶ 48                                C. Cynthia Woods

¶ 49    Cynthia Woods, a toxicologist with the Illinois State Police, testified that on August 13, 2013, she received a toxicology DUI kit containing two vials of blood and two bottles of urine belonging to defendant.[9] Woods performed tests and found citalopram and quetiapine present in his urine sample. Woods performed tests on defendant's blood and found "no volatiles":

> "According to our [standard operating procedures], we test blood for volatiles and urine for drugs unless, in the case of a fatal accident or aggravated DUI, in some cases we also test the blood for drugs, but in regular DUI cases we test blood for

---

[8] The record does not state the officer's first name.
[9] Woods testified that defendant's toxicology DUI kit arrived in her laboratory on March 29, 2013.

ethanol or methanol and that kind of volatile and the urine for drugs."

¶ 50　　　　On cross-examination, Woods testified that her report did not state the amount of citalopram and quetiapine detected in defendant's urine sample. Woods was also unable to testify to the amount of citalopram and quetiapine found in defendant's urine or how long these drugs remain in one's system after they are ingested. Some drugs remain in someone's system for a longer period than others. She was unaware of the half-life of citalopram and quetiapine, and did not know when they were ingested by defendant or how long they remained in his body.

¶ 51　　　　On redirect examination, Woods testified as to the effects of quetiapine and citalopram. As to quetiapine, Woods testified that she was familiar with warnings that the drug can cause dizziness or drowsiness and that it was not recommended to drive a vehicle if the driver was unaware of the drug's effects. As to citalopram, Woods testified that she was familiar with warnings that the drug may cause dizziness, drowsiness, and lightheadedness.

¶ 52　　　　On recross-examination, Woods testified that she was unaware of how long it takes for the drug to take effect in the body once it is ingested or how much of the drug someone would have to ingest in order to physically impair his or her ability to drive. Different drugs have different effects on different

people and the weight of an individual and what they drink might impact the effect the drug has on the body.

¶ 53                                        D. Sergeant Gregory Hart

¶ 54        Sergeant Hart testified that he had been employed by the Illinois State Police since 2002 and had approximately 19 years of law enforcement experience. As a certified standardized field sobriety instructor, he taught at the police academy, as well as conducted refresher courses for other troopers and local police departments as needed. Sergeant Hart attended the police academy and received training on how to administer and assess field sobriety tests. He also trains others in field sobriety tests. Throughout his career, he investigated approximately 75 DUI cases involving drugs. As a law enforcement officer he has come into contact with drug users "close to a thousand, 500" times.

¶ 55        Defense counsel and the assistant State's Attorney stipulated that Sergeant Hart was a drug recognition expert. However, defendant objected to Sergeant Hart's testifying about whether defendant was under the influence of drugs based solely on Sergeant Hart's review of reports and video footage. The trial court summed up the issue as follows:

        "THE COURT: I take it this [issue] was to whether or not the Court

        feels that this officer is capable of testifying as to his opinion as to

whether or not defendant was under the influence of drugs based upon this witness's expertise in drug recognition?

ASA: Yes.

DEFENSE COUNSEL: Correct.

THE COURT: There is no dispute that this witness can testify what a person under the-under drugs would exhibit-outward signs would exhibit-a person under certain drugs, whether they would exhibit certain signs; is that correct?

DEFENSE COUNSEL: Correct."

¶ 56     When asked about the training he received to be certified as a drug recognition expert, Sergeant Hart responded that he had taken a drug recognition course and studied seven different categories of drugs, including central nervous system depressants. Sergeant Hart took a final exam, which consisted of one written exam and 12 field studies that were evaluated by a certified instructor.  The field studies involved "consensual encounters with individuals" alleged to be under the influence of drugs and performing tests on them. The field testing consisted of a 12-step process, part of which was observing subjects' horizontal gaze nystagmus, measuring their pupil size in different lighting conditions, and checking their pulse rates, blood pressures, oral cavities, and nasal cavities. In addition, subjects were required to undergo a

modified Romberg balance test, where they had to estimate the passage of 30 seconds with their eyes closed and their head titled back. Sergeant Hart testified that one could form an opinion as to whether a person was under the influence of drugs without completing all 12 steps.

¶ 57       The State called Sergeant Hart as an expert to explain the effects of certain drugs. Sergeant Hart testified that a drug recognition expert might have more knowledge than a police officer on the subject. Sergeant Hart completed 100 hours of intensive classroom training. He also went through a basic review of field sobriety tests, human physiology, and drug pharmacology. This training was in addition to the training that he received as a police officer. The expert training is not training that a typical police officer would receive. Sergeant Hart was asked about the evaluations that he performed on individuals as part of his training. The evaluations were conducted in person.[10]

¶ 58       Sergeant Hart was questioned about a 12-step process used to determine whether a person was under the influence of drugs. The first step of the 12-step process was the breath alcohol test. In the event that there is no alcohol involved and drugs are suspected, an officer called a drug recognition expert. The second step of the process was to interview the arresting officer after he or

---

[10] Sergeant Hart did not observe defendant driving or any admissions by defendant. He rendered an opinion based on the reports and discussions he had with the arresting officer.

she effectuated the arrest. This allowed the arresting officer and expert to discuss the subject's behavior, appearance, and driving pattern. In this case, Sergeant Hart did not conduct step 2 of the process after defendant's arrest, but instead used the reports in place of that step. The third step was to conduct a preliminary examination of the subject including checking his or her pulse and ascertaining whether he or she was suffering from an injury or other condition unrelated to drugs. Sergeant Hart did not conduct this step and did not observe defendant's attitude, coordination, or speech. According to Sergeant Hart, "somebody else" made these observations and relayed the message to him.

¶ 59    In this case, Sergeant Hart did not conduct: the fourth step, which involves an eye examination of defendant for HGN, vertical gaze nystagmus (VGN) and a lack of ocular convergence;[11] the sixth step, which involves checking defendant's vital signs including his blood pressure, temperature, and pulse; the seventh step, which involves a darkroom examination to determine an estimation of defendant's pupil size under three different lighting conditions; the eighth step, which involves examining defendant's muscle tone; the ninth step, which involves checking injection sites and defendant's pulse a third time; or the tenth step, which involves listening to the subject's statements and

---

[11] Sergeant Hart was not questioned about step 5 of the 12-step process. Step 5 involves psychophysical tests that assist in determining the suspect's condition and whether he/she is able to operate a vehicle safely.

making his own observations.[12] Instead, Sergeant Hart read the report in this case and observed the video footage taken of the defendant at the scene of the accident.

¶ 60 Sergeant Hart testified that he could render an opinion without completing each of the 12 steps. He stated, "I don't have all the steps, but based off–from start to finish with the case, I would feel very comfortable in making an opinion, absolutely."[13]

¶ 61 On the objection of defendant, the trial court barred Sergeant Hart from rendering an opinion as to whether defendant was under the influence of antidepressants, based on the sergeant's review of police reports and the video footage taken of defendant at the scene of the accident. The trial court allowed Sergeant Hart to testify only "as an expert as to what the effects of antidepressants may have on a person." On cross-examination, Sergeant Hart

_____

[12] The record does not indicate whether Sergeant Hart was questioned specifically about step 11 (opinion of the evaluator) and step 12 (toxicological examination) of the 12-step process.

[13] The trial court ruled that Sergeant "Hart has the expertise to testify as to symptoms that someone under the influence of antidepressants, as is in this case, what those outward physical symptoms–what effect those drugs would have on someone." In making its ruling, the trial court stated, "There has been no testimony as to how many of these steps need to be done; there's been no testimony as to whether one step is more important than another one, but what I do find significant is that some of the–some of the things that were done or weren't done are not present here for the court to make an adequate determination as to whether or not it's admissible." The court further stated, "I am not going to allow you to testify as to whether – as to your opinion as to whether or not the defendant is under the influence of drugs because you were not there."

admitted that citalopram and quetiapine can have different effects on different people. The drugs have a durational effect. The indicators he testified about would not give any indication of how recently an individual had consumed the drug, and the drug ingested would wear off over a period of time. When analyzing an individual that he believes to be under the influence of drugs, he cannot make a determination of how much of that drug is in their system. The officer testified that, just because an individual has a particular drug in their system, it does not necessarily mean that they are under the influence of that drug.

¶ 62                          VI. Conviction and Sentencing

¶ 63        At the close of the bench trial on July 22, 2014, the trial court found defendant guilty of driving under the influence of drugs and failing to reduce his speed to avoid an accident. The trial judge reserved his ruling on count III (failure to provide proof of valid insurance) and required defendant to undergo a drug and alcohol evaluation for purposes of his sentencing hearing.

¶ 64        On August 21, 2014, defendant filed a posttrial motion for a new trial based on three claims: (1) that the trial court improperly denied a motion to quash the arrest for lack of probable cause despite the arresting officer's admission that the officer was not a trained drug recognition expert; (2) that the trial judge erred in allowing the State's drug recognition expert to testify

regarding the effects of two prescription drugs, citalopram and quetiapine; and (3) that a new trial was warranted because the State failed to demonstrate sufficient evidence to convict him and the trial court's reliance on chemical evidence for a charge of DUI was misplaced, because the mere presence of a prescribed drug was not a violation of the statute. On October 3, 2014, the trial court denied defendant's motion.

¶ 65 After hearing factors in mitigation and aggravation, the trial court sentenced defendant to two years of probation and ordered alcohol and drug abuse treatment, attendance at a victim impact panel, and random urine testing throughout his probation. The trial court ordered defendant to comply with a zero tolerance standard for alcohol or illegal drugs in his system. The trial court also ordered defendant to perform 240 hours of community service, pay mandatory fees and costs, and serve 364 days in the Cook County jail, which the trial court suspended, subject to a motion to vacate. The trial court stated it would consider vacating this portion of defendant's sentence if defendant successfully completed the probationary period ending on August 15, 2016. For failing to reduce his speed to avoid an accident, the trial court ordered defendant to pay $1,664 by the end of his probation. With regard to count III (failure to provide proof of valid insurance), the State stated it would file a "motion State SOL."

¶ 66　　　　On October 30, 2014, defendant filed a notice of appeal, and this appeal followed.

¶ 67　　　　　　　　　　　　　　　ANALYSIS

¶ 68　　　　On appeal, defendant challenges his conviction of driving under the influence of drugs. Defendant claims: (1) that the trial court erred when it denied his motion to suppress evidence based on a lack of probable cause that he was driving under the influence of drugs at the time of his arrest; (2) the trial court abused its discretion when it allowed Sergeant Hart's testimony for the limited purpose of discussing the general effects of the prescription drugs, citalopram and quetiapine; and (3) that the evidence was insufficient to show whether defendant was under the influence of drugs to a degree that it rendered him incapable of driving safely.　For the following reasons, we affirm defendant's conviction.

¶ 69　　　　　　I. Motion to Quash Defendant's Arrest and Suppress Evidence for
Lack of Probable Cause

¶ 70　　　　　　　　　　　A. Standard of Review

¶ 71　　　　In reviewing a trial court's ruling on a motion to suppress evidence under the fourth amendment, we apply the standard of review set forth by the United Supreme Court in *Ornelas v. United States,* 517 U.S. 690, 699 (1996). *In re Mario T.*, 376 Ill. App. 3d 468, 471-73 (2007) (relying on the decision in

*Ornelas* and applying a *de novo* standard of review on a motion to suppress). Under this standard, a trial court's findings of historical fact are reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the factfinder. *Ornelas,* 517 U.S. at 699. In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson,* 196 Ill. 2d 425, 431 (2001).

¶ 72        A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. *People v. Pitman,* 211 Ill. 2d 502, 512 (2004). Accordingly, we review *de novo* the trial court's ultimate legal ruling as to whether suppression is warranted. *Ornelas,* 517 U.S. at 699; *Pitman,* 211 Ill. 2d at 512; *Sorenson,* 196 Ill. 2d at 431.

¶ 73                                    B. Parties' Arguments

¶ 74        Defendant claims that Officer Morris detained him for an extensive period of time, without probable cause. Defendant argues that Officer Morris unlawfully prolonged the traffic stop when he ordered defendant to exit the police vehicle after defendant was placed there for "his safety," and to perform field sobriety tests. Defendant also claims that Officer Morris's act in placing defendant in the backseat of the police vehicle constituted an arrest without

probable cause. Defendant argues that Officer Morris arrested defendant "on a mere hunch" and that his suspicion that defendant was under the influence of a drug was unwarranted, since Officer Morris did not smell marijuana or alcohol, and nothing in his report indicated that he noticed any drugs, paraphernalia or prescription medication in plain view, nor did he testify to such. Defendant further argues that Officer Morris failed to call a drug recognition expert to the scene of the accident to conduct a proper investigation and render an accurate opinion of whether defendant was under the influence of a drug and whether he should be placed under arrest. Officer Morris had no experience with the particular drugs found in defendant's urine sample including: what they were, what effect they had on the human body, or when defendant had ingested them. Based on these considerations, defendant claims that the trial court improperly denied his motion to quash his arrest and suppress evidence for lack of probable cause.

¶ 75    In response, the State argues that Officer Morris was justified in moving defendant to the back seat of the police vehicle under the Fourth Amendment's "community caretaking" doctrine.[14] While engaging in his caretaking duties,

_____

[14] Community caretaking refers to the police's ability to act when "performing some task unrelated to the investigation of a crime, such as helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home. Courts use the term 'community caretaking' to uphold searches or seizures as

36

the officer uncovered further evidence of defendant's intoxication. The State argues that Officer Morris had probable cause to arrest defendant based on: (1) defendant's failure to reduce his speed to avoid an accident; (2) the officer's observation of defendant's impaired physical and mental state; (3) the position of the vehicles in the three vehicle accident; and (4) defendant's admission that he had consumed prescription drugs. Defendant's failure of the three field sobriety tests provided Officer Morris with additional probable cause. Accordingly, the State claims that the trial court properly denied defendant's motion to quash his arrest and suppress evidence for lack of probable cause.

¶ 76                              C. Probable Cause

¶ 77         The Illinois Supreme Court has recognized "three tiers of police-citizen encounters." *People v. Murray,* 137 Ill. 2d 382, 387 (1990); *People v. Gherna,* 203 Ill. 2d 165, 176 (2003). The first tier involves the formal arrest of a citizen, which requires probable cause. *Gherna,* 203 Ill. 2d at 176. The second tier involves temporary investigative seizures commonly known as a "Terry stop" (see *Terry v. Ohio,* 392 U.S. 1 (1968)), during which an officer may conduct a

reasonable under the fourth amendment ***. Community caretaking describes an exception to the warrant requirement." *People v. McDonough*, 239 Ill. 2d 260, 269 (2010) (holding that officer's act in seizing defendant was reasonable under the "community caretaking" exception and was undertaken to protect the public's safety). "[T]he 'community caretaking' doctrine is analytically distinct from consensual encounters ***." *People v. Luedemann*, 222 Ill. 2d 530, 548 (2006) (applying the "community caretaking" doctrine).

brief, investigatory stop of a citizen if the officer has a reasonable, articulable suspicion of criminal activity, and if that suspicion is more than a mere "hunch." *Gherna,* 203 Ill. 2d at 176. The third tier involves consensual encounters, which occur without coercion or detention and, therefore, do not involve a seizure. *Gherna*, 203 Ill. 2d at 176.

¶ 78      Probable cause exists when the facts and circumstances known to the arresting officer are sufficient to warrant a reasonable person's belief that the arrested individual has committed a crime. *Gherna*, 203 Ill. 2d at 176. A reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Officers are allowed "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. 418; see also *Ornelas*, 517 U.S. at 699 ("[in making] determinations of reasonable suspicion and probable cause" "a reviewing court should *** give due weight to inferences drawn from those facts by resident judges and local law enforcement officers")). "[A] police officer may draw

inferences based on his own experience in deciding whether probable cause exists." *Ornelas,* 517 U.S. at 700.

¶ 79     With regard to drug intoxication, Illinois courts have generally held " 'that the testimony of police officers that a defendant was under the influence of drugs would be sufficient, provided that the officers had relevant skills, experience, or training to render such an opinion.' " *People v. Foltz*, 403 Ill. App. 3d 419, 424 (2010) (quoting *People v. Vanzandt,* 287 Ill. App. 3d 836, 845 (1997)); *People v. Workman*, 312 Ill. App. 3d 305, 310 (2000). Here, Officer Morris received training at the police academy on drug and alcohol detection. He had also been involved in the gang unit and observed "hundreds" of people under the influence of drugs. The spectrum of drugs ranged from illegal drugs "such as cocaine and crack [where] you get erratic, irrational behavior" to "the other end of the spectrum such as anti-depressants and sleeping aids, [where] you get people that are tired and sleepy." He testified that, as a police officer, he relies on his specialized knowledge as well "knowledge that is common *** in [his] personal life." As to his knowledge of Ambien, Officer Morris testified that he was aware that it was a sleeping drug and that somebody who could not keep their eyes open and was sleepy or lethargic was consistent with someone on Ambien. Officer Morris also testified that defendant had admitted to him that he had taken prescription drugs, including Ambien. When defendant admitted

taking Ambien and other drugs, the officer had probable cause to believe that it had something to do with the conduct that the officer observed.

¶ 80        In addition to Officer Morris's training and experience, the facts observed by Officer Morris at the time he arrested defendant constituted probable cause to support the arrest. Defendant was the cause of the rear-end automobile accident that rendered his own vehicle inoperable and severely damaged. Defendant was driving the easternmost vehicle, and the other two vehicles involved in the accident were in front of him proceeding westbound. Defendant rear-ended the vehicle in front of him, causing his license plate to stick to the other vehicle. Defendant also exhibited signs of being under the influence of drugs including: (1) dilated pupils, (2) deliberate and lethargic movements, (3) a disheveled appearance, (4) difficulty keeping his eyes open and a sleepy appearance; and (5) speech that was mush-mouthed and slurred. Furthermore, defendant provided Officer Morris with conflicting answers about where he lived, where he had been, and how the accident occurred. When asked for his insurance card, defendant repeatedly handed the officer his AARP card. In addition, defendant failed each of the three field sobriety tests which the officer administered. Defendant nearly fell to the ground several times during the tests, two of which had to be terminated for safety purposes. Defendant also admitted he was prescribed Zoloft, Celexium, and Ambien. These facts were

ample for a reasonable person to believe that there was probable cause that defendant was under the influence of drugs to a degree that it rendered him incapable of driving safely.

¶ 81    The facts in *People v. Kirk*, 291 Ill. App. 3d 610 (1997), are similar to this case. In *Kirk*, the defendant caused a vehicle accident. *Kirk*, 291 Ill. App. 3d at 611. The officer who was called to the scene, observed that defendant's eyes were glassy and bloodshot, that his face was flushed, and that his speech was slurred. *Kirk*, 291 Ill. App. 3d at 612. The defendant displayed poor balance and coordination as he walked and seemed disoriented. *Kirk*, 291 Ill. App. 3d at 612. Defendant admitted to the officer that he had consumed alcohol. *Kirk*, 291 Ill. App. 3d at 612. While the trial court found probable cause to arrest the defendant for a DUI, it did not find probable cause to justify the officer's request for a urine sample, since "an officer cannot request multiple chemical tests if he has no reason to believe drugs other than alcohol are involved." *Kirk*, 291 Ill. App. 3d at 613. The trial court suppressed evidence of the defendant's urine sample which revealed the presence of cannabis, but allowed the blood sample which revealed that the defendant's blood-alcohol content (BAC) was 0.06. *Kirk*, 291 Ill. App. 3d at 613.

¶ 82    The appellate court reversed the trial court's holding that a police officer with probable cause to arrest a driver for DUI cannot perform "any or all of the

tests to determine whether the driver is, in fact, chemically impaired." *Kirk*, 291 Ill. App. 3d at 615. The appellate court held that, because "[t]here is no requirement that an officer have individualized suspicion of drugs and/or alcohol before requesting multiple chemical tests," the officer had probable cause to ask the defendant to submit to a urine sample. *Kirk*, 291 Ill. App. 3d at 615. Applying this same reasoning to the instant case, we find that Officer Morris had probable cause to arrest defendant even though he did not possess particularized knowledge of the specific chemical causing defendant's intoxication.

¶ 83    In addition, the record reflects, as the State argues, that Officer Morris's actions were reasonable within the "community caretaking" doctrine and thus not an unreasonable "seizure" in violation of the fourth amendment. *People v. Luedemann*, 222 Ill. 2d at 548 (applying the "community caretaking" doctrine). Officer Morris testified that, when he arrived on the scene of the crash site, he concluded that there had been a significant impact based on the damage done to defendant's vehicle and the vehicle ahead of it and thus, he suspected defendant might be injured as a result. Officer Morris testified that he asked defendant to exit defendant's damaged vehicle and sit in the backseat of the squad vehicle, in order to ensure defendant's safety as the officer prepared a crash report. We find that Officer Morris's actions were part of his valid community caretaking

function as a police officer. See, *e.g.*, *People v. Dittmar*, 2011 IL App (2d) 091112, ¶ 29 (finding that an officer performed his community caretaking functions when he pulled his squad vehicle behind defendant's vehicle, activated his emergency lights, and "had reason to believe occupants of [the] vehicle might need assistance"); *People v. Sturgess,* 364 Ill. App. 3d 107, 114 (2006) (holding that officers' act in arranging for defendant's transport to ensure her safe removal from a congested highway construction zone was a valid community caretaking activity). Considering all of the relevant circumstances surrounding Officer Morris's encounter with defendant at the accident site, and considering the officer's available options in arranging for defendant's safety, the officer acted reasonably to further his community caretaking function.

¶ 84    Accordingly, we affirm the denial of defendant's motion to suppress evidence, (1) finding Officer Morris had probable cause to arrest defendant and (2) finding that he acted to further his community caretaking function as a police officer.

¶ 85                II. Admission of Testimony From Drug Recognition Expert

¶ 86    Second, defendant claims that the trial court abused its discretion when it allowed Sergeant Hart's testimony for the limited purpose of discussing the effects of the prescription drugs citalopram and quetiapine.

¶ 87                              A. Standard of Review

¶ 88        The admission of evidence is within the sound discretion of a trial court,

and a reviewing court will not reverse the trial court absent a showing of an

abuse of that discretion. *Snelson v. Kamm,* 204 Ill. 2d 1, 24 (2003); *People v.*

*Hall,* 195 Ill. 2d 1, 20-21 (2000). An abuse of discretion occurs where the trial

court's decision is arbitrary, fanciful or unreasonable (*People v. Illgen,* 145 Ill.

2d 353, 364 (1991)) or where no reasonable person would agree with the

position adopted by the trial court (*Schwartz v. Cortelloni,* 177 Ill. 2d 166, 176

(1997); *Illgen,* 145 Ill. 2d at 364). Decisions of whether to admit expert

testimony are reviewed using this same abuse of discretion standard. *Snelson,*

204 Ill. 2d at 24; *People v. Reid,* 179 Ill. 2d 297, 313 (1997).

¶ 89                              B. Parties' Arguments

¶ 90        Defendant claims that it was improper for the trial court to admit

Sergeant Hart's testimony about the general effects of the two prescription

drugs found in defendant's urine. Defendant argues that the trial court abused

its discretion in allowing Sergeant Hart to testify because (1) Sergeant Hart was

"not a toxicologist and there was no quantifiable information as to how much of

the drugs were in defendant's system and how much was required in order to

establish those effects testified about"; (2) Sergeant Hart was not a "neutral

expert" and he "tailor[ed] his testimony to match, in some cases verbatim,

Officer Morris' report"; and (3) Sergeant Hart was not at the scene of the accident, conducted no investigation, and did not speak to defendant at any point in time. "[O]nce [Sergeant Hart's] testimony was limited, he simply excluded [defendant] from his testimony and testified in a general sense that people under the influence of the prescription drugs found in defendant's urine exhibit all the signs that Officer Morris mentioned in his report." Defendant further argues that because Sergeant Hart was not present at any point in time, he could not appropriately render testimony about the effects of the prescription drugs found in defendant's system.

¶ 91        The State argues that the trial court properly allowed the testimony from Sergeant Hart, which corroborated Officer Morris's observations.

¶ 92                    C. The Propriety of the Testimony of Sergeant Hart

¶ 93        In the case at bar, it is important to distinguish what is in dispute. First, there is no dispute about the validity of "drug recognition" as a legitimate field of expertise. The defense never objected to Sergeant Hart's testimony concerning his qualifications. As noted, Sergeant Hart testified that he was certified by "the state coordinator of the drug recognition expert program." The drug evaluation and classification program is sponsored by the International Association of Chiefs of Police and the National Highway Transportation Safety Administration. The program "enables police officers who are certified

as drug recognition experts to determine whether someone is under the influence of drugs or a combination of drugs and alcohol." The program involves a course tailored to the study of seven different categories of drugs including central nervous system depressants.

¶ 94     Sergeant Hart testified that the course included training on the identification of drugs such as quetiapine and citalopram. In addition, the program required participants to pass two different final exams and complete 12 field evaluations by a supervisor. Sergeant Hart testified that the 12 field evaluations entailed interacting with "live individuals." He described that, "One day we spent with the Department of Corrections in their parole office in Chicago. Parole agents went out, encountered their parolees. If they thought that they were under the influence of drugs, they brought them back to their office where we did our evaluations of them there." The evaluation of these subjects included a "12-step process *** part of which is checking the horizontal gaze nystagmus, measuring pupil size in different lighting conditions, pulse rates, blood pressures, checking oral activities, checking nasal cavities." Sergeant Hart characterized the 12 steps of analysis as "psychophysical tests" requiring the subject to perform a balance test, the one-leg stand test, a walk-and-turn test, the finger-to-nose test, and other evaluations.

¶ 95    Second, there is no dispute on appeal about the qualification or expertise of Sergeant Hart as a drug recognition expert. Sergeant Hart testified that he was employed by the Illinois State Police since 2002 and had approximately 19 years of law enforcement experience.  As a certified standardized field sobriety instructor, he taught at the police academy, as well as conducted refresher courses for other troopers and local police departments as needed. Sergeant Hart attended the police academy and received training on how to administer and assess field sobriety tests. He also trained others in field sobriety tests. Throughout his career, he investigated approximately 75 DUI cases involving drugs. As a law enforcement officer he has come into contact with drug users "close to a thousand, 500" times. Defense and plaintiff's counsel stipulated that Sergeant Hart was a drug recognition expert. The trial court held that "the trooper has the expertise to testify as to symptoms that someone under the influence of antidepressants, as is in this case, what those outward physical symptoms–what effect those drugs would have on someone."

¶ 96    The only issue that defendant raises on appeal is that the trial court abused its discretion when it allowed Sergeant Hart's testimony for the limited purpose of discussing the effects of the prescription drugs citalopram and quetiapine. The trial court barred Sergeant Hart from rendering an opinion as to whether or not *defendant* was under the influence of antidepressants on the

basis of the sergeant's review of only police reports and the video footage taken of defendant at the scene of the accident. The trial court allowed Sergeant Hart to testify only "as an expert as to what the effects of antidepressants may have on a person." The trial court stated:

"THE COURT: [Sergeant] Trooper, I am not going to allow you to testify as to whether–as to your opinion as to whether or not the defendant is under the influence of drugs because you were not there. And I know that experts review records and things and make opinions and come to opinions all the time such as a pathologist, such as a firearms expert, or a fingerprint expert. They're not there when it's done or whatever, but I think this is a little different because of the 12 steps that you have to do.

And I'm relying somewhat on my own experience that it would be– and I think I can, that being there in person and seeing it in real time is more –is probably more reliable, more effective, and I don't think at this point in what's been presented that we would have that here, so I'm going to deny him–or bar him from testifying as to the actual opinion as to the defendant, but he can certainly explain–if you wish, make–give testimony as to the effects of antidepressants on a person."

¶ 97    In response to the ruling, defendant objected in the following colloquy:

"ASA: Can [Sergeant Hart] testify about the effect of the specific drugs in the case?

THE COURT: Yes, he certainly can. And defense counsel has not raised any objection to it, and I think he can, so I will allow it. That is my ruling.

DEFENSE COUNSEL: Well, as to specific drugs, I would object because during my questioning I asked him if he was familiar with any kind of antidepressants and or these particular ones, and he said, 'I know the seven categories."

The trial court then overruled defendant's objection, which was not timely and defense counsel did not move to strike the testimony.

¶ 98    Defendant now raises on appeal that the trial court abused its discretion when it allowed Sergeant Hart's testimony for the limited purpose of discussing the effects of the specific drugs in this case. However, defendant moved to bar Sergeant Hart from rendering an opinion as to whether *defendant* was under the influence of antidepressants.

¶ 99    Under the "doctrine of invited error," a party " 'may not request to proceed in one manner and then later contend on appeal that the course of action was in error.' " *People v. Harvey,* 211 Ill. 2d 368, 385 (2004) (quoting *People v. Carter,* 208 Ill. 2d 309, 319 (2003)). To permit a party to use, as a

vehicle for reversal, the exact action which it procured in the trial court " 'would offend all notions of fair play' " and encourage duplicity by litigants. *Harvey,* 211 Ill. 2d at 385 (quoting *People v. Villarreal,* 198 Ill. 2d 209, 227 (2001)). When a party "procures, invites or acquiesces" to a trial court's evidentiary ruling, even if the ruling is improper, he cannot contest the ruling on appeal. *People v. Bush,* 214 Ill. 2d 318, 332 (2005). Therefore, defendant has waived his argument that the trial court abused its discretion when it failed to timely object to Sergeant Hart's testimony about the general effects of the specific drugs and failed to move to strike the testimony. However, even if defendant had made a timely objection, it would have been well within the trial court's discretion to overrule the objection because the testimony was relevant to the issue as to whether the arresting officer had probable cause to arrest defendant.

¶ 100                          III. Defendant's Conviction

¶ 101        Defendant's final contention on appeal is that the State failed to introduce sufficient evidence to prove him guilty beyond a reasonable doubt of driving under the influence of drugs or a combination of drugs to a degree that rendered him incapable of driving safely.

¶ 102                          A. Standard of Review

¶ 103        Due process requires the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Cunningham,* 212 Ill. 2d 274, 278

(2004) (citing *In re Winship,* 397 U.S. 358, 364 (1970)). When reviewing the sufficiency of the evidence, a reviewing court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); see also *Cunningham,* 212 Ill. 2d at 278. A reviewing court will not overturn a guilty verdict unless the evidence is "so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins,* 214 Ill. 2d 206, 217 (2005). Where a conviction depends on eyewitness testimony, the reviewing court may find testimony insufficient "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham,* 212 Ill. 2d at 280.

¶ 104                                    B. Parties' Arguments

¶ 105          Although the lab results of defendant's urine sample came back positive for citalopram and quetipaine, defendant argues that Cynthia Woods, the State's toxicologist, was unable to accurately testify to the following information: (1) the amount of those drugs in defendant's system; (2) when he consumed the drugs; (3) what effect they had on his body; (4) whether they made him incapable of operating a motor vehicle; or (5) how long the drugs had been in his body. Defendant further argues that Sergeant Hart, the State's drug

recognition expert, could not testify to this same information, and therefore, the State failed to meet its burden of proof to convict defendant of driving under the influence of drugs.

¶ 106    In response, the State argues that the following evidence proved beyond a reasonable doubt that defendant drove under the influence of drugs or a combination of drugs to a degree that rendered him incapable of driving safely: (1) defendant's admission that he took prescription drugs; (2) the position of the vehicles in the three-vehicle crash; (3) the observations of Officer Morris, the arresting officer, of defendant after the crash; (4) the other driver's observations of defendant after the crash; (5) the prescription drugs in defendant's urine; (6) the testimony of Sergeant Hart, a drug recognition expert, regarding the effects of citalopram and quetiapine, (7) the testimony of Cynthia Woods, a forensic toxicologist, on the effects of prescription drugs, and (8) the arresting officer's knowledge and experience in observing people under the influence of drugs, his observations here, field sobriety tests, and opinions.

¶ 107         C. Proof of Defendant's Guilt Beyond a Reasonable Doubt

¶ 108    The offense of driving under the influence of a drug or combination of drugs is committed when an offender: (1) drives or is in actual control of a vehicle (2) while under the influence of any drug or combination of drugs (3) to a degree that he or she is incapable of driving safely. 625 ILCS 5/11-501(a)(4)

(West 2014); see also *People v. Shelton*, 303 Ill. App. 3d 915, 921-22 (1989). In the case at bar, there is no dispute that defendant was in actual control of a vehicle. Thus, the first element is undisputed.

¶ 109                                   1. Under the Influence of Drugs

¶ 110        Even where there is circumstantial evidence provided by a credible witness, it is unnecessary for the State to present scientific evidence of "intoxication." *People v. Gordon,* 378 Ill. App. 3d 626, 638 (2007). Also, a defendant's admissions can provide direct evidence of intoxication to sustain a conviction. See *People v. Bitterman,* 142 Ill. App. 3d 1062, 1065 (1986). See also *Workman*, 312 Ill. App. 3d at 311.

¶ 111        In the instant case, defendant admitted he had been using prescription drugs. The trial court viewed the video of defendant's arrest and noted defendant swayed side to side during the field sobriety test. Defendant's admissions and conduct, coupled with the video footage of defendant, provide direct evidence that he was under the influence of drugs. Officer Morris observed that defendant had dilated pupils, deliberate and lethargic movements, a disheveled appearance, difficulty keeping his eyes open, the appearance of sleepiness; and slurred and mush-mouthed speech. Furthermore, defendant provided Officer Morris with conflicting and nonsensical answers about where he lived and how the accident occurred. When asked for his insurance card,

defendant repeatedly handed the officer his AARP card. In addition, defendant failed each of the three field sobriety tests the officer administered. Defendant nearly fell to the ground several times throughout the tests, two of which had to be terminated for safety purposes. Furthermore, the laboratory tests performed by Cynthia Woods, a toxicologist with the Illinois State Police, which found citalopram and quetiapine present in defendant's urine sample, further support the evidence that defendant was under the influence of drugs. Considering all this evidence in the light most favorable to the prosecution, a reasonable factfinder could find beyond a reasonable doubt that defendant was under the influence of a drug or combination of drugs while operating a motor vehicle.

¶ 112                          2. Incapable of Driving Safely

¶ 113          "The driving under the influence charge required the jury to find that defendant could not drive safely under the influence of the drugs found in his system." *People v. Mikyska*, 179 Ill. App. 3d 795, 805 (1989). It is not enough for the State to show drug use by the defendant; the State must also show that the defendant could not drive "safely under the drugs found in his system." *Mikyska*, 179 Ill. App. 3d at 805.

¶ 114          This contrasts markedly with the consumption of illegal drugs.  "Because possession of a controlled substance is unlawful *per se* (see 720 ILCS 570/402 (West 2008)), the State must establish simply that the defendant used or

consumed a controlled substance before driving." *People v. Martin*, 2011 IL 109102, ¶ 16; *People v. Rodriguez*, 398 Ill. App. 3d 436, 443 (2009) (Illinois law "creates an absolute bar against driving a motor vehicle following the illegal ingestion of any cannibis or controlled substance" without regard to physical impairment). By contrast, under the offense that defendant was charged with, the State must prove, as an element of the offense, that he was not only under the influence, but also under the influence "to such a degree that it rendered defendant incapable of safely driving." *Shelton*, 303 Ill. App. 3d at 921-22.

¶ 115    The evidence in this case was sufficient to prove that defendant was incapable of driving safely. As a result of the accident, defendant's vehicle sustained severe damage to its front end, was leaking fluid, and was inoperable. David Nielsen, one of the other drivers, testified that, as a result of the impact, his vehicle struck the rear of the vehicle in front of him. He observed that the back-end rear bumper of his vehicle was pushed in extensively and that the front license plate of the vehicle behind him was lodged around the exhaust pipe of his vehicle. Nielsen also observed that when he went to check on the defendant in the vehicle, defendant did not seem alert. Following the collision, when Nielsen asked defendant if he was okay, defendant did not answer, nor did he exit his vehicle.

¶ 116   Officer Morris's observations also indicate that defendant was incapable of driving. Officer Morris observed that defendant exhibited signs of intoxication including: (1) dilated pupils, (2) deliberate and lethargic movements, (3) a disheveled appearance, (4) difficulty keeping his eyes open and a sleepy appearance; and (5) speech that was mush-mouthed and slurred. Furthermore, defendant provided Officer Morris with conflicting answers about where he lived and how the accident occurred. When asked for his insurance card, defendant repeatedly handed the officer his AARP card. In addition, defendant performed poorly on each of the three field sobriety tests which the officer administered. Defendant nearly fell to the ground several times during the tests, two of which had to be terminated for defendant's and Officer Morris's safety. Thus, the evidence in this case is sufficient to prove that defendant was incapable of driving safely.

¶ 117   Therefore, based on the foregoing, we find that there was sufficient evidence beyond a reasonable doubt to convict defendant of driving under the influence of drugs to a degree that rendered him incapable of driving safely.

¶ 118                                CONCLUSION

¶ 119   For the foregoing reasons, we affirm the trial court's ruling on defendant's motion to suppress and conclude that the trial court did not abuse its discretion when it allowed limited testimony from a drug recognition expert

into evidence. In addition, we find that there was sufficient evidence to find defendant guilty of driving under the influence of drugs and failing to reduce speed. Accordingly, we affirm defendant's conviction and sentence.

¶ 120   Affirmed.