2023 IL App (2d) 220338-U
No. 2-22-0338
Order filed September 5, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE CITY OF LAKE FOREST, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 20-DT-895, 20-TR-29723 |
| | ) | 20-CM-1509 |
| | ) | |
| DESTINY C. BURGIN, | ) | Honorable |
| | ) | Bolling W. Haxall III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant was properly convicted of driving under the influence of cannabis based on the strong smell of burnt cannabis emanating from her car, her admission that she smoked two "blunts" 45 minutes earlier and was currently "high," her poor performance on the walk-and-turn test, and her general lethargy during the stop and arrest, suggesting she lacked the proper awareness and reflexes to drive safely.

¶ 2   After a bench trial, defendant, Destiny C. Burgin, was found guilty of driving under the influence of drugs (DUI), namely cannabis (625 ILCS 5/11-501(a)(4) (West 2020)), and child endangerment predicated on DUI (720 ILCS 5/12C-5(a)(2) (West 2020)). The trial court placed

defendant on 18 months' court supervision. On appeal, defendant contends that she was not proved guilty beyond a reasonable doubt of either charge. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Plaintiff, the City of Lake Forest, charged defendant with one count of DUI (cannabis) and two counts of child endangerment for committing DUI and thereby placing the lives of her passengers, D.B. and L.D., in danger.

 ¶ 5      At trial, the sole witness was Lake Forest police officer Tyler Saieg. On direct examination, he testified as follows. He had been an officer since early 2018. His training at the police academy and in the field included traffic enforcement, *e.g.*, DUI detection and administering field sobriety tests (FSTs). He was also trained in Advanced Roadside Impaired Driving Enforcement (ARIDE), which covered the standard FSTs and other drug tests.

¶ 6      Saieg testified that, on July 19, 2020, at about 1 a.m., he was parked in a fully marked squad car on the right (east) shoulder of northbound Route 41 in Lake Forest. He saw a car pass. It had no visible rear license plate. He followed the car for about 20 seconds and saw no other violations. Saieg activated his emergency lights, and the driver, defendant, pulled over onto the shoulder. Saieg exited his squad car and approached defendant. An adult female was in the front passenger seat. Two small children were buckled properly in child-safety seats in the back. As defendant rolled down her window, Saieg smelled the odor of burnt cannabis. He requested defendant's driver's license and proof of insurance. Defendant was "lethargic" but produced the requested information.

¶ 7      Saieg recorded the encounter on his squad-car camera and microphone. The video was admitted into evidence and played in court. We summarize the pertinent contents.

¶ 8    After pulling defendant over, Saieg approached her, explained the basis of the stop, and requested her driver's license and proof of insurance.  Defendant said that her license was in the middle console; she took it from there and handed it to Saieg.  He asked her about her insurance; she said her policy was new, so she gave him a policy number instead of a card.  At this point, Saieg asked her to roll her window down further.  She did so.  He asked her to exit the car.  She did so.

¶ 9    Outside, Saieg asked defendant, "How much weed did you smoke tonight?"  She responded, "Two blunts."  He asked her, "How long ago?"  She responded, "Maybe about 45 minutes."  Saieg told defendant that the car "reek[ed] of weed" and that she was "very lethargic."  Defendant responded, "Yes."  Saieg asked her, "Do you think you're high right now?"  She said, "Yes."  He asked, "Do you think you should be driving that car?"  Defendant responded, "I think I'm not impaired," adding that she took her child's safety seriously.

¶ 10    Saieg returned to his car to process the stop.  Defendant spoke to a backup officer.  Saieg returned and asked defendant to face him, which she did.  He asked her several questions, to which she responded appropriately.  She disclosed that, in April, she had been in a car accident in which she suffered a concussion and some leg injuries, but she had since recovered.

¶ 11    Saieg next administered several FSTs to defendant.  The first was the horizontal gaze nystagmus (HGN) test, in which defendant followed Saieg's finger with her eyes.  The second was the walk-and-turn test, in which defendant took nine heel-to-toe steps down the fog line, pivoted, and took nine more heel-to-toe steps back.  The third was the one-leg-stand test.  In the fourth test, defendant followed instructions to close her eyes, tilt her head back, count to 30 "in [her] head," and say "stop" when she reached 30.

¶ 12    After defendant completed the FSTs, Saieg arrested her.  As he handcuffed her and explained the arrest, she became agitated.  She cried and shouted, "Please."  She asked where her daughter would go; Saieg told her there was still an adult in the car and the occupants were not going anywhere.  Defendant calmed down somewhat.  She asked how she could get her bank information if she were jailed.  Saieg assured her that she would be released.  The recording ended.

¶ 13    Saieg testified that the HGN test showed that defendant did not have nystagmus in her eyes. He explained that a person under the influence of cannabis will not display nystagmus, but "the other things that [he] observed could be indicative of being under the influence of cannabis." Specifically, during the test, defendant's eyelids were drooping, and she frequently flicked her eyes in the direction opposite his finger.

¶ 14    Saieg testified that, during the walk-and-turn test, he observed six "clues": "breaking the instructional position, raising her arms more than six inches from her sides to maintain balance, [stepping] off the line, [stopping], [breaking] heel-to-toe, and [making] an improper turn."  Based on his training, two clues are sufficient to indicate impairment.  Defendant's overall demeanor during the test was "[l]ethargic."

¶ 15    Saieg testified that, after he arrested defendant, he drove her to the police station, where he picked up some documents, and then to a hospital to have her provide blood and urine samples. When he parked in the hospital's parking lot, he explained the documents to defendant, then asked her whether she wanted to provide blood and urine samples.  His testimony continued:

> "A. *** [W]hen asked if she wanted to provide blood and urine, she proceeded to have some form of a monologue with herself about the legal limit being a rather low threshold; and she made the decision eventually to not [provides samples], after some time

deliberating it [*sic*] with herself. During that deliberation, she was frequently closing her eyes, she was smiling to herself, and just in general kind of just talking to herself out loud.

Q. And how was her demeanor there in the back of the squad car then?

A. A mix of lethargic and what I might describe as like slap happy I guess, if that's a [*sic*]."

¶ 16    Saieg testified that, after defendant declined testing, he drove her to the police station. They spent about two hours there. As time passed, defendant's demeanor became "less lethargic[,]' and she became "more easily irritated." It appeared to Saieg that she was "sobering up."

¶ 17    Saieg testified that he had made approximately 50 arrests for DUI based on either alcohol or cannabis and had assisted other officers with 25 or 30 such arrests. He had also made somewhat fewer than 50 arrests for possessing or using cannabis. While in college, Saieg had seen people under the influence of cannabis 50 to 100 times. Based on his observation and training, Saieg opined that defendant was under the influence of cannabis when he stopped her vehicle.

¶ 18    Saieg testified that defendant told him that one of the children in the backseat was hers. The passenger identified the other child as hers.

¶ 19    On cross-examination, Saieg testified as follows. The National Transportation Highway Safety Administration (NHTSA) field manual sets out three phases of detecting a DUI. The first is "vehicle in motion." In this phase, there are several sets of clues for impaired driving. The first set relates to problems maintaining proper lane position. The second set relates to braking and speeding problems, such as unnecessary acceleration or deceleration and driving well under the speed limit. The third set includes "vigilance problems," such as driving at night with the headlights off and failing to signal properly. The final category is "judgment problems," such as tailgating and driving off the designated roadway. According to Saieg, defendant's driving did

not show clues in any of these categories. Moreover, in general, he saw nothing in defendant's driving to suggest that she was under the influence.

¶ 20 Saieg testified that defendant did not fumble with her license or drop it during the stop, but she was "lethargic." He did not see smoke or anything burning inside the car. As defendant opened her door and exited, she did not lean on the car. As she walked over to where Saieg had asked her to stand, she did so without stumbling or requiring assistance.

¶ 21 Saieg testified that he asked defendant when she had smoked the two blunts but not when she started smoking. He did not ask whether she had shared the cannabis with anyone or finished the blunts. Saieg conceded that the amount of cannabis in a blunt "[d]epends on the person." It could be "a small amount."

¶ 22 Saieg stated that, before administering the FSTs, he told defendant to face him; she complied. In administering the HGN test, he told defendant to put her feet together; she complied. Saieg did not need to remind defendant to follow his finger with her eyes or to keep her head still. Saieg noted that bloodshot eyes "could be" a clue for DUI but that defendant's eyes were not bloodshot during the test.

¶ 23 Saieg testified that, for the walk-and-turn test, he told defendant to turn around, place her left foot on the line, and place her right foot in front of it. She complied with these directions. She did not start the test until Saieg told her to start. Defendant took the correct number of steps down the line. On the return walk, her arms came up briefly, but she put them back down by her sides.

¶ 24 Saieg testified that, during the one-leg-stand test, he observed zero clues for impairment. Defendant did not sway, use her arms for balance, hop, or put her foot down.

¶ 25 Saieg testified that the final test he administered was the "modified Romberg balance test," which is a divided-attention test for signs of impairment by drugs. Defendant complied with

Saieg's directions, including to "[e]stimate 30 seconds in her head." Saieg testified that cannabis alters a person's perception of time and that people who are under the influence of cannabis "can" have trouble passing the test. However, defendant's estimate, 33 seconds, was within the five-second margin for not indicating impairment. Saieg did not observe tremors in defendant's body or eyelids, and she did not lose her balance during the test.

¶ 26    Saieg testified that he knew of the "lack of convergence test," which relies on observing a person's eyes to determine possible impairment due to drugs. He did not perform this test on defendant. He also could have given defendant the finger-to-nose test to detect drug impairment but did not do so. Saieg explained that the stop occurred before his ARIDE training, "so all those tests that [defense counsel was] describing [he] had not learned technically at that point."

¶ 27    Saieg testified that the arrest occurred early in the COVID-19 pandemic, when no vaccines existed. He acknowledged that a drug recognition expert (DRE) is a police officer trained to determine whether someone is under the influence of a drug and which drug is the cause. Saieg was not a DRE. While defendant was in custody, Saieg could have called in a DRE to examine her, but he did not. He admitted that the NHTSA manual suggests consulting a DRE when an officer suspects cannabis use.

¶ 28    Saieg reiterated that bloodshot eyes "could be" a clue for impairment by drugs but that defendant's eyes were not bloodshot. At the station, defendant's demeanor changed near the end, when she was preparing to be released. He saw this as a sign that the effect of the cannabis was wearing off.

¶ 29    On redirect examination, Saieg testified that not all the various clues for impairment are present in every case that results in an arrest. While at the hospital, defendant never expressed

concern about COVID-19; the only reason she gave for declining testing was that it might reveal how much cannabis she had used.

¶ 30    After hearing arguments, the trial court stated as follows.  First, Saieg saw "absolutely no bad driving visible in the relatively brief period" he observed defendant driving.  Defendant responded properly to Saieg's activation of his emergency lights.  Thus, nothing about defendant's driving indicated that she was under the influence.  The court continued:

> "The [FSTs], overall she does well.  There are certainly some issues with the walk and turn, but her one legged stand is excellent.  Her—the 30 second counting in the head she nails, so there's very little from the [FSTs] to indicate that she is under the influence.
>
> The issue for me is the [d]efendant's statements, and it is a 20 second conversation where [Saieg] indicates to the [d]efendant that he could smell a strong odor of *** cannabis.  The [d]efendant really doesn't dispute that.  He asks how much cannabis *** the [d]efendant has had to smoke.  She replies tonight ***.
>
> Now, tonight could go back multiple hours.  I mean this is one in the morning, but *** there's no indication from that statement that the two blunts she referred to were smoked, you know, that afternoon or that morning.
>
> In fact, if you're going to be really technical, I guess there's an argument that she limited the smoking time to that evening or that night.
>
> The [d]efendant is asked do you think you are high right now, and she replies yes.  She then responds that she is not *** impaired, and [her] argument is essentially that the term high is not really quantified, and that's certainly true.
>
> I think that the argument for the phrase, *** are you drunk right now, I think there's a popular perception among the public that would relate that to probably a .08, the point

that most people view as being impaired; but what's relevant here is that while maybe high is not quantified, the [d]efendant indicated that she believed she was high at the moment the question was posed; and the [d]efendant, her view of the term high, is particularly relevant here.

Again, the defense argument that what one person means by high is different than what another person means, that's true, but ultimately the question is whether or not this defendant was impaired by the use of cannabis.

*** [A]lcohol can affect people differently based on what you have consumed, *** over what period of time, how large you are. ***.

That's true for cannabis as well. *** [T]he question here is whether or not this defendant at that time was impaired.

Now, the term high has a meaning; *** the meaning of the term high is [']is the cannabis having a physical effect on a person?['] And whether the term is high versus drunk or buzzed, I think it is a common enough time [*sic*], whether or not cannabis has been legal for a period of time, the term high is one that has been around for decades; and at that moment, the [d]efendant believed she was high.

And I do think combined with the rest of the evidence in this case, which is the refusal to complete testing at the hospital, which I am considering for consciousness of guilt, *** I do think it is some evidence that the [d]efendant believed that she was likely to test positive for cannabis at a limit that would be problematic for her.

Ultimately, the [d]efendant smoked cannabis in about the hour before she drove. Now that doesn't in itself indicate that she was impaired; but given she believed she was

high at the time she was driving, combined with all the other evidence, I do believe [that plaintiff met its burden of proof]."

The court found defendant guilty of all three charges.

¶ 31     Defendant moved to reconsider the judgment. At the hearing on the motion, she contended that a person could use the term "high" to mean as little as a "head rush" from one "puff," which would not prove impairment to drive. She contended further that, although she had admitted being high, she had denied being impaired and had performed well on the FSTs. She argued that there was insufficient evidence that she was impaired and "a bunch of evidence that suggest[ed] that she was sober."

¶ 32     In response, plaintiff argued that the evidence proved more than trivial cannabis consumption: defendant admitted to smoking two blunts only 45 minutes before the stop. Further, her refusal to take blood and urine tests showed her consciousness of guilt. And, although defendant's driving was not suspicious, Saieg followed her for less than two miles. In the walk-and-turn test, defendant provided more than the two clues needed to indicate impairment.

¶ 33     Defendant replied that Saieg never obtained specific information about the amount of cannabis in the blunts, when defendant started smoking them, or whether she shared them with anyone. Further, defendant's refusal to provide blood and urine samples did not necessarily indicate consciousness of guilt given that consumption of marijuana was no longer strictly prohibited. Moreover, the blood concentration of tetrahydrocannabinol (THC) necessary to support a DUI conviction had not reached the same level of "cultural understanding" as the blood concentration of alcohol required to support a DUI conviction.

¶ 34     The trial court denied the motion. The court noted that defendant had admitted not merely smoking cannabis but being "high." Thus, "[defendant] felt at that time there was a physical effect

of *** cannabis on her." She also admitted to using cannabis only 45 minutes earlier. The court continued:

"There was evidence [of] some balance issues. More significantly, [Saieg] testified that [defendant] was moving lethargically.

I think *** I referred to it as deliberate; but anyway, it appeared to be a slower, more conscious movement than normal, something noticeable, perceptible.

I think really when I consider the statements regarding being high, *** the admission to using relatively recently[, and] *** what the officer testified he observed, both in the performance on the test and just movements generally, I think it was sufficient.

* * *

Driving is a skill that requires a lot of attention. *** [W]hat's particularly relevant here, a person be able [sic] to respond quickly to what happens when they are driving in order to be able to drive safely. A car cuts you off. It's a sudden turn. There's, *** any number of things that can happen when you are driving that requires [sic] you to react quickly.

If [defendant] was unable to respond or act as quickly as she normally would due to consumption of cannabis, I do believe that renders her unsafe; and, *** there was no bad driving that I saw. It is a limited period of time; and *** it is a fairly straight and easy road. ***.

*** It's not being able to maintain the vehicle in the middle of the lane. It's being able to respond quickly to anything that would have required her to do so.

***

Just for purposes of appeal, I'm going to be very clear. Her statement was significant evidence. It was not the only evidence. *** [B]ut if I'm being absolutely honest, had she not said that she was high, I think I very likely would have returned a different verdict."

¶ 35    This timely appeal followed.

¶ 36                                    II. ANALYSIS

¶ 37    On appeal, defendant contends that she was not proved guilty beyond a reasonable doubt of DUI. She also contends that, because DUI was an element of both child endangerment charges, she also was not proved guilty beyond a reasonable doubt of those charges.

¶ 38    In considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002). Assessing the credibility of the witnesses and determining the weight to be given the evidence are matters within the prerogative of the fact finder. *People v. Holmes*, 141 Ill. 2d 204, 243 (1990). Moreover, we must allow all reasonable inferences from the evidence in favor of the State. *People v. Baskerville*, 2012 IL 111056, ¶ 31.

¶ 39    To obtain a conviction of DUI as charged, the State had to prove that defendant drove or was in actual physical control of her vehicle while she was under the influence of cannabis to a degree that rendered her incapable of safely driving. See 625 ILCS 5/11-501(a)(4) (West 2020). Defendant challenges the sufficiency of the evidence that her cannabis use made her incapable of safely driving.

¶ 40    Defendant attacks the inculpatory evidence in several specific regards. We note that her argument is based entirely on separate analyses of specific portions of the evidence; she does not

include an overall assessment of the cumulative impact of these analyses on the evidence as a whole. In addressing defendant's argument, we shall initially consider her specific contentions and then provide an overall assessment of the sufficiency of the evidence as a whole.

¶ 41    First, defendant contends that Saieg was not qualified to give opinion testimony on whether she was under the influence of cannabis. She notes that Saieg was relatively inexperienced when he stopped her and had yet to complete his training in FSTs. Plaintiff responds that it did not move to qualify Saieg as an expert but relied on the established principle that a police officer's opinion that the accused was under the influence of drugs is admissible and can be sufficient evidence of DUI if the officer had the relevant skills, experience, or training to render such an opinion. See *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 79.

¶ 42    Here, Saieg testified that, on July 19, 2020, he had been a police officer for somewhat more than two years, had been trained in detecting DUI, had made or assisted in many arrests for cannabis-based DUI, and for the use of cannabis, and, as a college student, had seen people under the influence of cannabis 50 to 100 times. The trial court had the prerogative to decide that these qualifications sufficed to make Saieg's opinion probative of whether defendant was under the influence of cannabis to the extent that it would impair her driving. See *id.* ¶¶ 43, 45, 79 (the trial court properly credited the opinion of an officer who had been involved in two or three drug-based-DUI investigations and who, though not a DRE, was trained in drug detection and had observed hundreds of people who were under the influence of drugs).

¶ 43    Further, as the State notes, defendant never objected to Saieg's qualifications to provide an opinion. Thus, to the extent that the trial court must qualify an officer as an expert to testify as to whether the accused was under the influence of drugs (see *People v. Jacquith*, 129 Ill. App. 3d 107, 114-15 (1984)), defendant forfeited any error based on this rule. See *Ciborowski*, 2016 IL

App (1st) 143352, ¶ 99. Instead of moving to bar Saieg's opinion testimony, defendant sought through cross-examination to attack his qualifications and thus persuade the court to give little weight to his opinion. She pursues the same course here: she requests that we redecide Saieg's credibility and reweigh his opinion evidence. We may not and shall not do so. We note further that the court did not stress Saieg's opinion and apparently would have reached the same result without it.

¶ 44 Second, defendant contends that her performance on the FSTs did not support a finding that she was intoxicated at the time. To a degree, this argument is beside the point: in pronouncing defendant guilty, the trial court specifically stated that "very little" from the FSTs indicated that she was under the influence of cannabis. However, in denying defendant's posttrial motion, the court did place some weight on the walk-and-turn test and the "balance issues" she displayed on the video. Thus, we consider the results of the FSTs and their bearing on the finding of guilt.

¶ 45 As with defendant's first challenge to the evidence, she essentially requests that we reweigh the evidence of the FSTs. Again, we decline to supplant the trial court as finder of fact. Although defendant's performance on the FSTs cut both ways, the court properly considered that she provided six clues on the walk-and-turn test, four more than needed to indicate intoxication. While defendant opines that her failures were slight and her performance was affected by wind and the traffic, these possible inferences were for the trial court to consider, and we may not disturb its resolution of these issues.

¶ 46 Third, defendant contends that neither her driving nor her interaction with Saieg was probative of impairment or intoxication. We disagree. Certainly, the trial court concurred with defendant that nothing was amiss with her driving, and our review of the squad-car video confirms the characterization. However, the court also noted that Saieg witnessed defendant drive for only

a very short time. Thus, the court found it of lesser importance that defendant's driving was not suspicious. We will not disturb this assessment.

¶ 47    As for defendant's interaction with Saieg, he commented to defendant during the stop that she was "lethargic," and he described her the same way in his testimony. Our review of the video confirms his account: although defendant answered Saieg appropriately, her demeanor from the stop to her arrest was consistently sluggish. The court was within its prerogative in agreeing with Saieg here. It noted that defendant's slow and tired-sounding responses to Saieg were probative of impairment, as safe driving requires alertness to sudden dangerous developments and the ability to respond quickly to those developments. Although defendant now speculates that her lethargy might have resulted from the timing of the stop and her distrust of the police in the wake of the recent murder of George Floyd, the court was not required to draw these dubious inferences.

¶ 48    Defendant fails to address Saieg's testimony that, after he asked defendant about testing, she responded with a lengthy dialogue with herself, which was not entirely normal or appropriate. Further, near the end of her detention at the police station, her affect changed, indicating to Saieg that she was "sobering up." The trial court could credit this testimony, which defendant also does not address, as evidence that she was intoxicated when she drove.

¶ 49    Ultimately, defendant's challenge on these matters is an argument that the evidence could have been stronger, which does not bear on whether the evidence was sufficient.

¶ 50    Fourth, defendant attacks the probative value of her admission to Saieg that she was "high." She contends that the trial court should have considered her "yes" as admitting only that she had been using cannabis. She argues that Saieg asked her a leading question; that "high" is a term with no fixed meaning; that she followed up her admission with a statement that she was not impaired

and was fit to drive; and that she made the admission only because she was "acquiesc[ing] to a show of authority informed by her racial, social, and female position in society."

¶ 51    Once again, defendant insists that we disregard the trial court's weighing of the evidence and drawing of reasonable inferences therefrom and substitute our own conclusions—or, more accurately, *her* conclusions. We decline.

¶ 52    It defies common sense to argue that an admission to being "high" merely established consumption: the term is not as vague as defendant suggests, and the common understanding of it is that *something*, here cannabis, has produced "an excited, euphoric, or stupefied state" in a person. *High*, Merriam-Webster's Collegiate Dictionary 546 (10th ed. 1993). Thus, by admitting that she was high, defendant conveyed that the functioning of her mind and senses had been significantly affected by her use of cannabis.

¶ 53    Further, we note that, even if Saieg's question were leading, defendant was at liberty to simply answer, "No." Thus, the trial court could reasonably conclude that defendant would not have made a serious admission against her interest had she not believed it. Further, the court could reasonably give little weight to her statement that she considered herself fit to drive; the court could see it as an attempt to undo the damage from her admission that she was high, and also reason that a person who is high on cannabis might not be the best judge of her own ability to drive. Finally, it is the sheerest speculation that defendant made such a damaging admission only because of her racial or gender identity or current social conditions. Rather, the court could reasonably find that she made the admission simply because it was true. Finally, defendant's admission that she was high was well corroborated by the strong odor of cannabis coming from her car, her admission that she had smoked two blunts 45 minutes earlier, and—as noted—her general languor. We note that, although Saieg did not ask defendant how much cannabis she

actually consumed, she volunteered that she had smoked "two blunts" without qualifying or minimizing the import of those words.

¶ 54 Fifth, and finally, defendant argues that the trial court erred in giving weight to her refusal to submit to chemical testing, because that refusal proved only that she had consumed cannabis, a fact that she had already admitted. Again, we decline defendant's invitation to substitute our conclusions (or hers) for those that the court drew. Based on what defendant said in refusing the request, the court reasonably inferred that defendant believed that the testing would reveal that she had consumed a substantial amount of cannabis. In this respect, what was important was not what the law actually provided as to the "legal limit," but what defendant subjectively believed about the applicable law. The court could reasonably infer that, in refusing testing, defendant feared that the results would show that she had been driving with a level of THC in her system that the law recognized as showing unfitness to drive. Thus, the court properly considered defendant's refusal to undergo testing.

¶ 55 In sum, defendant's challenges to the evidence either rely on factors that the trial court properly did not consider crucial or invite us to substitute our judgment for that of the court on the weight of the evidence and the reasonable inferences to draw therefrom.

¶ 56 We now summarize the evidence, viewed in the light most favorable to the prosecution. After observing an equipment violation on defendant's car and following her for a short distance, Saieg stopped her. Defendant's car smelled strongly of burnt cannabis, and she admitted to having smoked two blunts 45 minutes before the stop. Moreover, she admitted that she was now "high," allowing an inference that she had been no less affected while driving, at least for the previous three-quarters of an hour or so. Defendant was coherent and able to respond to Saieg's questions and requests, but she was slow, subdued, and lacking energy to an extent inconsistent with safe

driving. She passed several FSTs, one of which (the HGN test) had little relevance to cannabis intoxication, but even there she displayed lethargy and some distraction. She failed one highly pertinent test—namely, the walk-and-turn test—by a substantial margin (six clues with only two needed to indicate intoxication). While in custody, defendant was still lethargic but became less so over time, indicating that, in Saieg's opinion, she was "sobering up." While in custody, defendant refused chemical testing after engaging in a confused conversation with herself, suggesting that she believed the results would be unfavorable. Saieg, who had basic training and personal experience in detecting when people were under the influence of cannabis, testified that, in his opinion, defendant was under the influence on July 19, 2020.

¶ 57    We conclude that this evidence was sufficient to allow the trial court to find beyond a reasonable doubt that defendant drove while under the influence of cannabis to an extent that rendered her driving unsafe. The court rightly concluded that defendant's recent consumption of a substantial quantity of cannabis, to the point where she admitted that she was "high," seriously affected her ability to drive safely, in part by dulling her senses and slowing her reaction time.

¶ 58                                  III. CONCLUSION

¶ 59    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 60    Affirmed.